CUMBERLAND PACKING CORP. and Stadt Corporation, Plaintiffs,

v.

MONSANTO COMPANY, The Nutrasweet Company, The Nutrasweet Kelco Company, and Olympia Industries, Inc., Defendants.

No. 97 CV 6938.

United States District Court, E.D. New York.

March 27, 2001.

**242**

Martin G. Raskin, Steinberg & Raskin, New York City, for plaintiffs.

Joseph Diamante, Pennie & Edmonds LLP, New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs Cumberland Packing Corporation and Stadt Corporation (collectively "plaintiff") brought this action claiming trademark and trade dress infringement, trademark dilution, and false advertising against defendants Monsanto Company, The NutraSweet Company, The Nutra-Sweet Kelco Company, and Olympia Industries, Inc. (collectively "defendant") pursuant to 15 U.S.C. §§ 114, 1125(a), 1125(c), New York General Business Law §§ 349–350, and the New York common law of unfair competition.

Plaintiff is the maker of Sweet'N Low and NatraTaste brand sweeteners and defendant is the maker of EQUAL, Nutra-Sweet and Sweetmate brand sweeteners.

In January 1999, plaintiff moved for a preliminary injunction to prevent defendant from infringing the Sweet'N Low and NatraTaste trade dresses, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); from infringing and diluting the Sweet'N Low trademark in violation of sections 32, 43(a), and 43(c) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c); and from falsely advertising its Nutra-Sweet brand sweetener in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Defendant moved to dismiss plaintiff's false advertising claim.

The court heard argument on the motions on October 28, 1998.

In a Memorandum and Order dated January 12, 1999 the court denied plaintiff's motion for a preliminary injunction and granted defendant's motion for summary judgment with respect to plaintiff's false advertisement claim (the "1999 decision").

Plaintiff subsequently dismissed all but three of their claims against the defendant. The remaining claims are all based on plaintiff's claim that the trade dress of defendant's NutraSweet brand sweetener is likely to be confused with plaintiff's NatraTaste brand sweetener. Defendant moves for summary judgment on these claims.

I

The facts of the case are set forth in the 1999 decision, familiarity with which is assumed. A brief review of the facts for present purposes follows.

A predecessor to the Monsanto Company, G.D. Searle Co. ("Searle"), developed aspartame in 1965 and obtained a patent for the substance in 1970. Searle named its brand of aspartame NutraSweet and created a red and white swirl logo to accompany the name. In 1982, Searle introduced Equal brand tabletop sweetener. All boxes of Equal displayed the Nutra-Sweet brand name and swirl. Billions of packets bearing the NutraSweet name and swirl were distributed to consumers.

Defendant's patent on aspartame expired in December 1992 and a number of companies, plaintiff included, entered the

aspartame market. In 1993, plaintiff introduced its own aspartame-based table top sweetener and called it NatraTaste. Plaintiff positioned NatraTaste as a value brand sweetener, selling for half the price of Equal.

Monsanto introduced a value brand aspartame-based sweetener in 1997 and named the product NutraSweet in order to capitalize on the selling power and wide recognition enjoyed by the name. NutraSweet is priced to compete directly with NatraTaste.

Plaintiff's NatraTaste box is rectangular with an overall blue coloring using primarily lighter blue tones. The name "Natra-Taste" in large script font appears on the upper part of both the front and back panels. The letters are in light green with white outlining. A photograph of a coffee cup atop a saucer occupies the foreground, slightly to the right. Other coffee cups and saucers to the left create shadows in the background. To the right of center, almost in the middle of the coffee cup, is a bright pink burst highlighting the advertisement stating "Same Sweetener as EQUAL ... At A *Sweeter* Price." The top and side panels also display the Natra-Taste name in the same style but slightly smaller.

Defendant's NutraSweet box is rectangular like the NatraTaste box but has thinner side panels and is not as wide along the front. The box is light blue overall with more subtle gradations in tone than the NatraTaste box. The Nutra-Sweet name is displayed across the top third of the panel in thick, black block letters with the red and white swirl Nutra-Sweet logo just above the name. The bottom half of the panel contains a picture of a coffee cup resting on a saucer. Balanced on the saucer is a tilted sweetener packet with the NutraSweet name and logo printed on it. The back panel is identical to the front and the side panels feature the NutraSweet name and logo.

## II

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Unsworn declarations, subscribed by the declarant in compliance with 28 U.S.C. § 1746, may be substituted for affidavits.

The substantive law governing the case will determine those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1356.

Summary judgment in a trade dress action is appropriate "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir.1996).

According to plaintiff, three facts remain in dispute, (i) the similarity between plaintiff's and defendant's trade dresses (ii) actual confusion and (iii) the defendant's bad faith in adopting its trade dress. Such determinations are often questions of fact, but "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source." *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir.1983). If the court finds that there is no reasonably disputed factual issue, summary judgment is warranted.

### III

■ To prove trade dress infringement plaintiff must show (1) that its trade dress is inherently distinctive or has acquired a secondary meaning and (2) there is a likelihood that consumers will be confused as to source or sponsorship between plaintiff's and defendant's product due to their trade dresses. A trade dress need not have widespread recognition among consumers to be distinctive. It need only serve to identify a product as emanating from a particular source. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992).

In the 1999 decision the court found that the combination of the elements in plaintiff's trade dress creates a "suggestive" package capable of identifying the product with a particular source. Since distinctiveness has been established the court turns to whether there is a significant likelihood of confusion as to source or sponsorship between plaintiff's and defendant's trade dresses.

■ To determine whether there is the requisite likelihood of confusion as to source or sponsorship between the two trade dresses the court applies the factors described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Those factors are: (1) the strength of the prior owner's mark; (2) the similarity between the marks; (3) the competitive proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion as to source or sponsorship; (6) the defendant's good faith; (7) the quality of defendant's product; and (8) the sophistication of the buyers. Although the *Polaroid* court developed these factors to apply to cases in trademark the same factors apply to determine likelihood of confusion as to source or sponsorship between trade dresses. *See e.g., Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir. 1992).

In the 1999 decision the court determined that the third, fourth, and seventh *Polaroid* factors do not apply in this case. Moreover, as discussed above Plaintiff says that there are genuine issues of fact with regard to only three *Polaroid* factors (i) similarity of the trade dresses (ii) actual confusion and (iii) the defendant's bad faith. The court will address each in turn.

#### (i) *similarity of the trade dresses*

The court addressed the similarity of the trade dresses in its 1999 decision. The court found that it was "unlikely that a reasonable prudent purchaser would find the overall image of the two boxes confusingly similar." Both boxes displayed their product names on their respective boxes in different fonts and colors. The Nutra-Sweet swirl figured prominently on the NutraSweet package.

█ The conspicuous use of a well-know logo and product name sufficiently distinguish defendant's trade dress from plaintiff's. Indeed, these differences alone may preclude a finding of similarity. *See e.g., Merriam–Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 71 (2d Cir.1994); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1045–1046 (2d Cir.1992).

The court also noted that the NatraTaste box is significantly wider and longer than the NutraSweet box and has a bright pink burst on the surface, which the NutraSweet box does not have.

█ The total images of the NatraTaste and NutraSweet trade dresses are so different that as a matter of law there is no substantial similarity that would create a likelihood of consumer confusion as to source.

### (ii) *actual confusion*

Plaintiff has submitted new evidence bearing on the question of alleged actual confusion, the fourth *Polaroid* factor. In their motion for a preliminary injunction plaintiff sought to prove a likelihood of consumer confusion by relying on four surveys performed by Dr. Michael Rappeport. The court analyzed the surveys and their results according to the seven standards enumerated by Judge I. Leo Glasser in *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189 (E.D.N.Y. 1983). The standards are that (1) the "universe" or product market is properly defined; (2) a representative sample of that universe is selected; (3) the questions to be asked of the interviewees are framed in a clear, precise and non-leading manner; (4) sound interview procedures are followed by competent interviewers with no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered is accurately reported; (6) the data is analyzed in accordance with

accepted statistical principles; and (7) the objectivity of the entire process is assured.

The court determined that the results of the surveys were unreliable because of serious flaws in the protocol and methodology. As a threshold matter the universe was over-inclusive in that it contained "users or buyers of sugar substitutes within the past six months." The relevant universe would have been people with a current interest in purchasing an aspartame-based sugar substitute.

The controls in two of the surveys were inappropriate because they did not net out consumer confusion based on legally irrelevant factors—namely the overall blue coloring and the similarity of the products' names. Given the inadequacy of the controls, Dr. Rappeport should have sought to directly approximate the background noise by analyzing the reasons people gave for their confusion. He did not.

The court also found that the two-room array methodology did not accurately simulate the market conditions under which consumers typically make their decisions. This method prevented consumers from viewing the products next to one another so that they could "eye the two products more or less simultaneously" as they would when purchasing the products.

After the court's 1999 decision, plaintiff conducted a new survey (the "revised survey") designed to correct the flaws found by the court in the surveys submitted in support of plaintiff's motion for preliminary injunction. Like the other surveys, the revised survey was to provide evidence of actual confusion.

### The Revised Survey

In the revised survey, Dr. Rappeport changed the universe to consist of individuals who have either purchased a box of aspartame-based sugar substitute in the past six months or expect to purchase a

box of aspartame-based sugar substitute in the next six months. People who meet either of these criteria can be considered to have a current interest in purchasing an aspartame-based sugar sweetener. The universe in the revised survey is properly defined.

Dr. Rappeport acknowledged the court's concern about respondent guessing. After asking if the respondent thought any of the sugar substitutes in the second room were made by the same company as NatraTaste he included an implicit instruction not to guess, telling the participants "if you don't know, please say so."

But despite the court's suggestion that the two-room array did not represent true market conditions the revised survey adhered to the two-room method. When asked why he did not change the protocol to a one-room array as suggested by the court, Dr. Rappeport stated that he believes that the court's suggestion was merely a question of "substituting one correct method for another."

Dr. Rappeport maintains that both methods are correct because confusion can occur in two ways: (1) when a consumer sees one of the two products outside the store and then sees the other product in the store and/or (2) when a consumer sees one of the two products out of the store context in an advertisement or in use and then sees the product in the market where they can eye the products simultaneously. Dr. Rappeport says he prefers the two-room array because it addresses circumstances where only one of the products is sold by a store and where the consumer may only be able to see one of the two products at a time due to store placement of the products.

To address the problem of unreliable controls Dr. Rappeport created four variations of the original NutraSweet box (the "new controls") to act as control stimuli. He believed the modifications he made in the boxes would account for factors legally irrelevant to confusion and "tease out" the causes of confusion. In addition to the new controls, the survey included the original Four Brands controls used in the previous surveys (Equal, Sweet Servings, Sweet Thing, and Sweet One).

The survey respondents were divided into five sub-groups. Each respondent entered the first room where they viewed a box of NatraTaste and then entered a second room to view five additional boxes.

Of the five boxes in the second room, four were the Four Brands and the fifth box varied depending on the subgroup being interviewed. The fifth box was either:

(1) the original NutraSweet box as sold in stores;

(2) the original NutraSweet box modified by replacing the original multi-tone blue color with a solid blue color matching the primary color used in the original box;

(3) the original NutraSweet box with a solid blue color, but a bit darker than the primary blue of the original multi-toned box;

(4) the original NutraSweet box with a solid blue color the same shade as the primary blue of the original box and no coffee cup; or

(5) the original NutraSweet box with a solid blue background darker than the primary shade of the original multi-toned box and no coffee cup.

Once in the second room the interviewer asked following:

Q1. Please look at this box of aspartame-based sugar substitute as if you were considering buying it.

Q2. Do you think that any of these sugar substitutes are made by the same company that made the first box you saw?

Q3. Which one or more of these sugar substitutes do you think are made by the same company as the first box you saw?

Q4. Why do you say that?

Q5. If the respondent mentioned color as a reason for thinking that one of the sugar substitutes in the second room was made by the same company that made the first box they saw they were asked: When you say color or coloring, precisely what do you mean by that?

The four new controls were designed to illuminate the reasons for any confusion between plaintiff's and defendant's products. Dr. Rappeport contends that substantial differences in the level of confusion reflect the effect of the changes made in "the overall look and feel" of the trade dress of the original NutraSweet box.

Dr. Rappeport reported that of the forty respondents that viewed the original NutraSweet box stimulus 38% believed that the NutraSweet product was made by the same company that makes NatraTaste. Of the eighty respondents that were shown the solid light blue version of the original NutraSweet box, 40% thought that it was made by the same company that makes NatraTaste. Fifty-five respondents saw the solid dark blue version of the original NutraSweet box and 15% of them said they thought the two were made by the same company. Thirteen percent of the forty respondents who saw the solid light blue version of the NutraSweet box without a coffee cup graphic thought that NatraTaste and NutraSweet were made by the same company. Eighteen percent of the forty respondents who saw the solid dark blue NutraSweet box with no coffee cup graphic thought that NutraSweet and NatraTaste were made by the same company.

Dr. Rappeport used the Four Brands as in the previous surveys to determine the "noise" level. He averaged the percentage of respondents that thought one of the Four Brands was made by the same company that makes NatraTaste and subtracted this average, or "noise" level, from the number of respondents that thought that NutraSweet was made by the same company as NatraTaste. He calculated the noise level at thirteen percent and subtracted that number from the thirty-eight percent of respondents that thought the original NutraSweet package was made by the same company that makes NatraTaste. That left twenty-five percent of respondents confused as to source between NutraSweet and NatraTaste.

Plaintiff argues that the results of the revised survey show that it is not the similarity of the names and the color blue per se that cause confusion, but the combination of the particular shade of blue and the coffee cup.

All of the new control packages used blue as the primary color and displayed the NutraSweet name. Thus, plaintiff argues, any change in the level of confusion cannot be due to the name or color, which did not change, but is due to the elements that did change, for instance, the shade of blue or the coffee cup. Plaintiff concludes that use of the NutraSweet name alone does not cause a high degree of consumer confusion.

Dr. Rappeport believes that the four new controls sufficiently isolate the reasons for consumer confusion. He did not conduct an analysis of the reasons respondents gave for their confusion.

The court has reviewed the results of Dr. Rappeport's survey as well as his methodologies and his testimony at depositions. The court seriously questions not only the methodology and protocol of the survey but the probative value of the survey results.

Several of the court's recommendations contained in the 1999 decision were not

incorporated into Dr. Rappeport's revised survey. The court previously stated that the two-room sequential survey method did not adequately resemble actual market conditions yet the revised survey employed the same two-room array. The court remains unconvinced that a survey using this protocol can determine actual market confusion.

When asked why he did not use a one-room side-by-side survey of the products Dr. Rappeport responded that he felt both methods were correct and that the question was "merely one of substituting one correct method for another." While both methods may indeed be correct, the court believes that the one-room array more accurately simulates the market conditions of these products and is a more appropriate gage of whether there is a likelihood of confusion in the marketplace.

According to Dr. Rappeport there was no reason to choose a two-room array over a one-room array protocol. Given that fact and the court's suggestion that a one-room array would be more accurate, the continued use of the two-room array is puzzling.

Dr. Rappeport also continued to use the same primary "confusion" question as used in the previous studies. The court found the question leading, a fact which was compounded by the lack of explicit instructions against guessing. In addressing the court's concern in the revised study Dr. Rappeport in effect made a 120 degree turn around a 380 degree problem. He left the primary "confusion" question unchanged, and thus leading. At the end of the question he attached the rather perfunctory, "If you don't know, please say so." Not exactly an explicit instruction against guessing.

When asked about the phrasing of this question Dr. Rappeport testified that there was "no intent to change [the question] in any way." Perhaps he believed that adding the implicit instruction not to guess

cured the question of its flaws. In the court's opinion it did not.

The primary flaw in the previous surveys was the selection of control stimuli. Dr. Rappeport believed that using the new controls he developed in the revised survey would correct this flaw. Proper controls approximate "background noise", or confusion unrelated to similarities in protectable elements of trade dress. This noise is subtracted from the total confusion level to isolate legally meaningful confusion.

Contrary to Dr. Rappeport's contention, the variations on the original NutraSweet box that he used as controls in the revised survey did not "measure noise in such a way as to demonstrate the degree to which the confusion between the boxes is caused by the trade dress of the boxes."

The structure of the revised survey was not oriented towards isolating the confusion causing factors. The survey used the Four Brands to approximate the noise level. The court previously stated and Dr. Rappeport agreed that the Four Brands "could not possibly net out confusion" based on the product names or the blue coloring of the boxes. Nevertheless the Four Brands appeared in the revised survey ostensibly to "provide context" and eliminate random guesses.

While the ineffective old controls remained part of the survey the new controls failed to perform properly. As far as the court can tell, the variations of the NutraSweet box, the new controls, did not control for anything in a way that can assist in determining what actually caused confusion among the respondents. All of the modified boxes were blue and displayed the NutraSweet name. In this they are not materially different from the original NutraSweet box in any legally relevant way.

Dr. Rappeport claims that because the confusion levels changed when modifications other than removal of the name were made that such change cannot be the result of the name. Therefore, he continues, any change in the confusion level approximates confusion that results from factors other than the name. This seems to do indirectly that which could be done directly by removing the NutraSweet name from the box.

Appropriate controls would effectively eliminate the name as a factor causing confusion. Here the name cannot be eliminated as a factor causing confusion because the name was never eliminated from the allegedly infringing box. It would have been instructive to see how participants would have responded to a variation of the NutraSweet box that replaced the well-known brand name. Since this was not done we simply do not know.

Likewise as to the survey's use of the color blue. As the court noted in its 1999 decision the color blue serves a functional purpose in the aspartame-based sweetener market and is not a protectable element of plaintiff's trade dress. Color is generally not protectable and drawing a line between a shade and a color is an exercise in hairsplitting in which this court will not engage. The NutraSweet box was the only box in the second room of a similar shade to the NatraTaste box. The controls do not net out this legally irrelevant similarity.

In the most critical respects the revised survey is no better than the previous ones this court discounted as seriously flawed. The essential comparison made by the respondents is nearly identical. As in the prior surveys the respondents saw the NatraTaste box in one room and in the second room they saw a variation of the original NutraSweet box along with the Four Brands. Only one of the Four Brands boxes has a predominantly blue background. This box is a very dark blue several shades darker than the light blue hues of the NatraTaste and NutraSweet boxes. None of the Four Brands has a name sounding remotely like NatraTaste.

There was another obvious flaw in the new controls. The variations of the Nutra-Sweet box, both light blue and the darker blue, with the coffee cup removed are inappropriate and thoroughly unrealistic. When the coffee cup was removed it was not replaced with any other graphic and every other detail on the box was unchanged. In place of the coffee cup was a conspicuous absence in the middle of the front panel. The sweetener packet, tilted on angle so as to lean against the cup, was left tilting in a seemingly random fashion. The results of the survey indicate that these two non-coffee cup variations caused the lowest levels of confusion. This is hardly surprising. These boxes look unauthentic and contrived. Comparing the confusion levels caused by these two so-called controls to the other NutraSweet box variations cannot result in any legally meaningful data.

Dr. Jacob Jacoby objected to Dr. Rappeport's use of "controls that could never be compelled to be used in the marketplace and are therefore unrealistic stimuli for present purposes." Plaintiff responded to this criticism by pointing out that "a sugar pill is the standard medical control." Plaintiff's reliance on the placebo analogy is misplaced. Medical experiments test the substance of the medication and its affects. In a medical trial the placebo is designed to be visually identical to the tested medication so that the participants cannot distinguish it from the other medication. Participants are not supposed to know they are taking something different.

By contrast, the value of a trade dress is its ability to visually distinguish the product from others in the same market. Visual modifications that cannot be enforced in

the market do not provide meaningful evidence of actual confusion. The test is not whether the products can or do create confusion in the abstract but whether that confusion affects "the purchasing and selling of the goods or services in question." *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 582–3 (2d Cir.1991). "Trade [dress] infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id.* at 583 (quoting Restatement (Third) of Unfair Competition § 20 (Tent. draft No. 2, 1990) reporter's note at 179).

Any evidence of legally cognizable confusion provided by the revised survey is purely indirect. Plaintiff cannot attribute any of the confusion to any element of their trade dress nor can it eliminate any irrelevant factors as sources of confusion. The analysis of the survey results does not focus on the actual number of confused responses but on changes and differences in the number of those responses. It is unclear what these differences tell the court. Plaintiff can only point to the study for the proposition that certain modifications in the NutraSweet box cause more confusion than others. That is a vague and abstract conclusion and does not raise a genuine issue as to any material actual confusion.

Dr. Rappeport testified that analysis of the "Why do you say that?" question asked of respondents to clarify the reasons for their confusion has value "depending on what you get out of the control[s] and how clear the data is." The court agrees. Because the new controls did not eliminate the name and color as factors causing confusion and the data was not clear in its conclusions the court examined the reasons that respondents gave for their confusion. The court obtained the responses as recorded in Dr. Leo Kaplan's declaration. Plaintiff did not dispute the accuracy of the responses as reported by Dr. Kaplan so the court will assume they are accurate.

The following table organizes the confused responses and lists the reason(s) each respondent gave for their confusion.

*Why do you say that [NutraSweet is made by the same company that made NatraTaste?]*

Quotes of reasons given, organized by category

| No. | NutraSweet Variation | Color Similar | Design Similar | Name Similar | Other |
|---|---|---|---|---|---|
| 1 | Original | "Because the coloring of the box reminds me of the other box" | "It seems to have the same layout" | | |
| 2 | Original | "It's the same color" | | | |
| 3 | Original | | "Same kind of advertisement. Not clouded. It's pretty plain and simple" | | |
| 4 | Original | | | "Same Nutra in the name. This is basically the only thing that looks similar" | |
| 5 | Original | "The color of the package" | "The art and graphics" | | "The shape of the box" |

| No. | NutraSweet Variation | Color Similar | Design Similar | Name Similar | Other |
|---|---|---|---|---|---|
| 6 | Original | "It's the same color" | | | "Looks less generic" |
| 7 | Original | "Color and picture" | | | "Bland photography. Lighting is terrible" |
| 8 | Original | | "Because it looks like the same box" | | "Has same nutrition facts box, ingredients" |
| 9 | Original | "Because of the color of the box" | | | |
| 10 | Original | "cause the color of the box is the same, just cause the color of the box was the same it reminded me of the other one" | | | |
| 11 | Original | "Because it's the same color" | | "The other one is Nutra-Sweet" | |
| 12 | Solid light blue | "The blue with the black lettering" | "The box looked about the same" | "It sort of said NatraSweet on the other box" | |
| 13 | Solid light blue | "It's the same color box. Powder blue" | "The same presentation" | | |
| 14 | Solid light blue | "The blue box" | | | |
| 15 | Solid light blue | "The blue coloring" | | | |
| 16 | Solid light blue | "The blue box. The color of the box" | | | |
| 17 | Solid light blue | "It's the same blue color box" | | | |
| 18 | Solid light blue | "The coloring. Softer, similar to the other." | "The design of the package" | | |
| 19 | Solid light blue | | | | "The coffee cup" |
| 20 | Solid light blue | | | "Because it sounds the same; the name" | |
| 21 | Solid. light blue | "It looks like it comes from the same company because of the color" | "The box is similar" | | |
| 22 | Solid light blue | "The color and the name" | "Because it looks similar" | "The color and the name" | |
| 23 | Solid light blue | | | "It's Nutra-Sweet" | "Because of the writing" |

| No. | NutraSweet Variation | Color Similar | Design Similar | Name Similar | Other |
|---|---|---|---|---|---|
| 24 | Solid light blue | "The package is blue and the logo on top of it" | "The look" | "Because of the name on it" | |
| 25 | Solid light blue | "The box is blue and the other is blue too" | | "Because it sounds the same" | |
| 26 | Solid light blue | "There is no difference in color" | | | "No calories—it has no saccharin" |
| 27 | Solid light blue | "No difference in the color. The color is basically the same" | | | "No calories and it has saccharin. That's basically it" |
| 28 | Solid light blue | "The shade of blue is like the first box I saw" | | | "The size of the box is very similar. The lettering is similar also" |
| 29 | Solid light blue | | | | "Box shape and size is similar" |
| 30 | Solid light blue | | "They look like the same box" | "Both say nutra" | "0 calories" |
| 31 | Solid dark blue | "Because of the color of the package" | | | |
| 32 | Solid dark blue | | | | "They all have a cup of liquid and sweetener" |
| 33 | Solid dark blue | | | "Because the first word is the same" | |
| 34 | Solid dark blue | "Because of the color and the pakate [sic]" | | | |
| 35 | Solid dark, no cup | | "Because of the package. The symbol" | | "It's a hundred packs in a box" |
| 36 | Solid dark, no cup | "The blue color looks alike with both boxes" | "The box looks similar" | | |
| 37 | Solid dark, no cup | "The color of the box" | | | "About the same size of box" |
| 38 | Solid dark, no cup | "The colors are similar" | | "The name is similar" | |
| 39 | Solid dark, no cup | | | "It's similar to the name. It is NutraSweet like the first box" | "The nutritional listing is the same" |
| 40 | Solid light, no cup | "the color of the box" | | | |

| No. | NutraSweet Variation | Color Similar | Design Similar | Name Similar | Other |
|---|---|---|---|---|---|
| 41 | Solid light, no cup | | | "It mentions about the NutraSweet the no calorie sweetener" | |
| 42 | Solid light, no cup | | | | "It looks like it has the same kind of ingredients" |
| 43 | Solid light, no cup | "Their similar colors" | | | |
| 44 | Solid light, no cup | | . | "It just sounded like the same kind of product" | |

Of the forty-four respondents who thought that NutraSweet and NatraTaste emanated from the same source, twenty-nine cited color as a reason for their confusion (1, 2, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 24, 25, 26, 27, 28, 31, 34, 36, 37, 38, 40, 43). Ten respondents mentioned only color (2, 9, 10, 14, 15, 16, 17, 31, 40, 43) and six listed color along with one or more factors unrelated to trade dress, such as the name (11, 25, 38) or ingredients (26, 27). These sixteen responses should be disregarded.

Fifteen of the forty-four "confused" respondents cited the name as a reason for their confusion. Five of those nine cited solely the name and four cited the name and one or more factors unrelated to trade dress. All nine of these responses should be disregarded.

Thirty-seven of the forty-four mentioned either the color or the name of the products as the reason for thinking that the products were made by the same company. Only seven of the forty-four respondents who thought NutraSweet and NatraTaste emanated from the same source did not mention the name or the blue coloring as a reason for their confusion.

Viewing the responses in the light most favorable to the plaintiff, only twenty of the total 255 respondents gave legally relevant reasons showing confusion as to source of the two products. Moreover, this number is probably inflated because the court did not discount several questionable responses. For example, respondent nineteen cited the coffee cup graphic as the sole reason for confusion and the court previously stated in the 1999 decision that the cup served a functional purpose.

The court also did not disregard a number of vague answers that give little if any insight into the reasons for confusion and whether such confusion is actionable. Respondent twenty-two confused NutraSweet box for NatraTaste because of "the color and the name" and "because it looks similar" though it is quite possible that the NutraSweet box looked similar because of "the color and the name." Likewise, respondent thirty-six chose NutraSweet because it was "blue" and "the box looks similar."

Respondent thirty stated that the NutraSweet box "looked like the same box" as NatraTaste but added that the both boxes said "nutra." This respondent seems to have confused NatraTaste for NutraSweet rather than the reverse, not surprisingly since NutraSweet had been used exclusively by the defendant long before NatraTaste made its appearance. The same "reverse confusion" took place

with respondents twenty-four and thirty-five. Respondent twenty-four cited the name, color, logo, and "look" of the Nutra-Sweet box as similar to the NatraTaste box but NatraTaste does not have a logo, only NutraSweet does. Yet, the response did mention that the "look" was confusingly similar and this response was included for that reason.

Dr. Rappeport testified at his deposition that he believes respondents "don't tend to think in terms of trade dress" and may not be capable of distinguishing the sources of their confusion. This is quite possible. The court did not discount the vague responses described above because there may be a similarity in "the general look and feel" of the packages that respondents find hard to pin down.

The court points out that this 7.84% (20 out of 255) confusion is strikingly close to the 7–69% confusion found by the court in the 1999 decision (nine confused responses out of a total one hundred and seventeen persons) surveyed. Neither result is sufficient to raise an issue of material fact as to the likelihood of consumer confusion.

■ The weakness of the survey as evidence of actual confusion is highlighted by the fact that plaintiff has presented no evidence of actual confusion in the marketplace. Both products have been on the market since the fall of 1997. That is ample time for at least a single occurrence of consumer confusion to surface. While plaintiff's failure to document any instance of actual consumer confusion does not preclude a finding of actual confusion the court may infer from the absence of such evidence that there is minimal, if any, likelihood of confusion. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir.1983).

### (iii) *Defendant's Bad Faith*

Plaintiff argues that defendant designed its trade dress with the intention of capitalizing on plaintiff's reputation and goodwill. The record shows otherwise. Defendant adopted the NutraSweet trade dress for several legitimate reasons. Two of these reasons are particularly apparent to the court, (i) to take advantage of the wide recognition and popularity of the Nutra-Sweet name and logo and (ii) to compete with its most likely competitor, Natra-Taste, a product likely so-named to take advantage of defendant's established and widely recognized NutraSweet name.

In designing the NutraSweet package the defendant intended to capitalize on the goodwill built around its own powerful NutraSweet name and logo. Although plaintiff presents notes from the NutraSweet design team to show that defendant intended to copy the NatraTaste trade dress, these notes show that the "large swirl" and the use of the phrase "the original" figured prominently in design discussions. The dappling and shading of blue that plaintiff points to as infringement was a result of use of the industry standard blue coloring on the box and highlighting the name and logo with lighter shades. The object of the shading is to accentuate the NutraSweet name. These elements distinguish defendant's product from plaintiff's and build on defendant's strong reputation in the aspartame-based sweetener market.

■ Defendant clearly designed its trade dress with the NatraTaste package in mind. Awareness of another's trade dress does not give rise to an inference of bad faith. *See Lang*, 949 F.2d at 583–84. Plaintiff relies on statements made by employees of Monsanto that the NutraSweet product was developed not only to capitalize on its long use of the NutraSweet name but also as a "gorilla warfare shelf-competitive brand to NatraTaste" aimed "to take share away from NatraTaste" as evidence of bad faith. But competition is not bad

faith. NatraTaste posed a competitive threat and was the leading product in the market defendant was entering. "[C]opying in order to market a functionally equivalent alternative .product might well benefit consumers, which is one of the aims of the Lanham Act." *Fun–Damental Too, Ltd., v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005 (2d Cir.1997).

Even if defendant did copy certain elements of plaintiff's trade dress, which is not at all evident, copying *per se* does not prove bad faith in determining confusion. For copying to be evidence of confusion the defendant must have copied for the purpose of causing confusion. *See, e.g., Edison Brothers Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987). Placement of the NutraSweet name in bold black capital letters and the unique NutraSweet logo just above the center of the box contradict allegations that the defendant sought to confuse consumers about the source of their product. Plaintiff has not presented sufficient evidence to support a reasonable finding that the defendant intended its design to confuse purchasers as to the source of the products.

## IV

After reviewing the new survey evidence submitted by plaintiff and considering the relevant *Polaroid* factors the court concludes that plaintiff has failed to raise a genuine issue of material fact as to the existence of a significant likelihood that reasonably prudent purchasers of NatraTaste would be confused into purchasing NutraSweet. Defendant's motion for summary judgment on all plaintiff's remaining claims is granted.

So ordered.