Ronald B. BROCKMEYER, Plaintiff,

v.

The HEARST CORPORATION, et al., Defendants.

No. 01 CIV. 7746(JGK).

United States District Court, S.D. New York.

March 4, 2003.

---

Ronald B. Brockmeyer, Germany, NY, Pro se.

Charles W. Grimes, Leora Herrmann, Grimes & Battersby, Mamaroneck, NY, Edmund J. Ferinand, III, Grimes & Battersby, LLP, Norwalk, CT, for Defendants.

### OPINION AND ORDER

KOELTL, District Judge.

This is a trademark infringment action by the plaintiff, Ronald B. Brockmeyer, alleging that the publishers and distributors of "O The Oprah Magazine," namely the Hearst Corporation; Harpo Print, LLC; Does 1–50; and XYZ Corporations 1–50, (collectively "the defendants"), infringed on the registered trademark held by the plaintiff, "<<O>>", in violation of Sections 32(1) and 43(a) of the Lanham Act (15 U.S.C. §§ 1114(1) & 1125(a)), New York common law regarding unfair competition, and the New York anti-dilution statute, N.Y. Gen. Bus. Law § 360–1. The defendants filed a counterclaim, pursuant to 15 U.S.C. § 1119, seeking a declaratory judgment canceling the plaintiff's trademark, and seeking reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1117(a). The defendants have moved for summary judgment dismissing the plaintiff's Complaint arguing, among other things, that there is no likelihood of either actual or potential consumer confusion between the plaintiff's use of the trademark

in association with his <<O>> magazine, focused on erotica and sadomasochism, and "O The Oprah Magazine" which is focused on the lives of modern women, as guided by the values of Oprah Winfrey. Consequently, the defendants argue that there is no basis under which the plaintiff could recover for infringement.

At the commencement of this action, the plaintiff, who was represented by counsel, moved for a preliminary injunction to prevent the defendants from using the terms "O", "O Magazine" or variations thereof in connection with the publication, distribution, and sale of magazines or other products during the pendency of this action. By Opinion and Order dated June 27, 2002 this Court denied the plaintiff's motion for a preliminary injunction. *See Brockmeyer v. Hearst Corp.*, No. 01 Civ. 7746, 2002 WL 1402320, at *13 (S.D.N.Y. June 27, 2002). After the denial of the motion for a preliminary injunction, the plaintiff proceeded through discovery and this motion for summary judgment pro se.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship.*, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22

F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993); *see also Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir.1998) (collecting cases).

Where, as here, a pro se litigant is involved, although the same standards for

dismissal apply, a court should give the pro se litigant special latitude in responding to a summary judgment motion. *See McPherson v. Coombe,* 174 F.3d 276, 279 (2d Cir.1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest'") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). In particular, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See McPherson,* 174 F.3d at 281; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *Ruotolo v. IRS,* 28 F.3d 6, 8 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). Express notice of a failure to respond was provided to the plaintiff, and the plaintiff did file a timely response to the defendants' motion for summary judgment.

## II.

◼ The defendants have filed a statement of undisputed facts as required by Local Civil Rule 56.1(a) and the plaintiff responded with a statement of undisputed material facts; however, the plaintiff's statement fails to admit or deny any of the facts the defendants set forth as being undisputed, as required by Local Civil Rule 56.1(b). The plaintiff's statement merely recounts some of the various procedural history of this and other related cases, but does not set forth the facts relevant to the disposition of this motion. The plaintiff's failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed. *See* Local Civil Rule 56.1(c); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam); *United States v. All Right, Title and Interest in Real Property and Appurtenances,* 77 F.3d 648, 657–

58 (2d Cir.1996); *John Street Leasehold, LLC v. Capital Mgmt. Res., L.P.,* 154 F.Supp.2d 527, 534 (S.D.N.Y.2001), *aff'd* 283 F.3d 73 (2d Cir.2002). The plaintiff was specifically warned by the defendants' Notice that that the failure to submit a statement in response to the defendants' Rule 56.1 Statement would result in the material facts in the defendants' Rule 56.1 Statement being deemed admitted. Nevertheless, given the plaintiff's pro se status, the Court has carefully reviewed the factual basis for the motion for summary judgment.

There is no genuine dispute with respect to the following facts. The plaintiff, Ronald B. Brockmeyer, a German resident, was from 1988 to 1994 the United States representative of a corporation that published an adult-oriented, fetish fashion magazine (the "Techcom Magazine"). (Defs.' Rule 56.1 Stmt. ¶¶ 1, 2.) Techcom Magazine had on its cover a trademark, an <<O>>, which was a stylized letter "O" in large type, in the upper center of the cover, flanked by double gradient signs. (Defs.' Rule 56.1 Stmt. ¶ 3.) The cover also contained the words "Fashion, Fetish & Fantasy" or "Fetish, Fashion and Fantasy." (Decl. of Dennis H. Cavanaugh dated October 1, 2001, Exh. B.)

After Techcom magazine's parent company, Techcom Verlags and Vertiebs GmbH ("Techcom") filed for bankruptcy in February, 1995, the plaintiff purchased the trademark rights for the <<O>> mark from Techcom's bankruptcy administrator. (Defs.' Rule 56.1 Stmt. ¶ 5.) The plaintiff is the record owner of U.S. Federal Trademark Registration No. 1,979,482 for the mark <<O>> for use in connection with "magazines, books and catalogs in the fields of fashion, adult entertainment, adult novelties and videotapes; [and] posters and calendars." (Defs.' Rule 56.1 Stmt.

¶ 30.) The registration for this mark was issued on June 11, 1996. (*Id.*)

In 1995 and 1996, the plaintiff published issues numbered 25 and 26 of a magazine that featured the <<O>> mark on the cover, featured prominently in the upper center of the page ("<<O>> Magazine"). (Defs.' Rule 56.1 Stmt. ¶ 7.) The covers of Issues 25 and 26 also contained the words "The Art of Fetish, Fashion & Fantasy." (*Id.*) Issue 25 contained, among other things, photographs of whip-bearing, naked women engaged in sadomasochistic and lesbian acts, a report covering the "Europerv 5" fetish convention, and a short fiction piece whose content contained descriptions of whipping, paddling, and bondage. (Defs.' Rule 56.1 Stmt. ¶ 9.) No more than 8,290 copies of this issue were distributed in the United States and Canada, and no more than 947 copies were actually sold in the United States. *Brockmeyer*, 2002 WL 1402320, at *9. Similarly, Issue 26 contained photographs depicting female nudity, sadomasochism, lesbianism, fetish fashion, and also contained erotic short fiction. (Defs.' Rule 56.1 Stmt. ¶ 10.) No more than 15,278 copies of Issue 26 were distributed in the United States and Canada, and no more than 9, 272 copies were actually sold in the United States. *Brockmeyer*, 2002 WL 1402320, at *9.

Another <<O>> Magazine was not published until June, 2001 when the Euromedia company, under the direction of the plaintiff, published Issue 27 of the magazine, whose cover contained a large version of the <<O>> mark, along with the words "The Art, The Fashion, The Fantasy." (Defs.' Rule 56.1 Stmt. ¶¶ 13, 14.) This issue contained no advertisements and little text, and contained photographs similar to those found in issues 25 and 26. (Defs.' Rule 56.1 Stmt. ¶ 17.) Issue 28, containing similar content as prior issues, was published in the Fall of 2001, and its cover used the <<O>> mark in

large type along with the words "The Art, The Fashion, The Fantasy." (Defs.' Rule 56.1 Stmt. ¶¶ 20,22.) A total of 12,000 copies of Issue 27 were allegedly distributed in the United States. *Brockmeyer*, 2002 WL 1402320, at *9. A total of 13,500 copies of Issue 28 of <<O>> Magazine were allegedly distributed in the United States. *Brockmeyer*, 2002 WL 1402320, at *9. Issues 27 and 28 of were distributed in the United States primarily to bookstores and newsstands. (Defs.' Rule 56.1 Stmt. ¶¶ 24, 27–28.)

There are a least six other publications distributed in the United States that bear the letter "O" as a component of a composite mark or as the first letter of a mark. (Defs.' Rule 56.1 Stmt. ¶ 34.) Two of these "O" marks have some form of trademark protection in the United States. (Defs.' Rule 56.1 Stmt. ¶¶ 35–36.)

A defendant, the Hearst Corporation, through another defendant-subsidiary, publishes the "O The Oprah Magazine," a magazine created through a collaboration between the defendants and Oprah Winfrey, an internationally renowned media personality known for her wholesome image and interest in the improvement of women's lives. (Defs.' Rule 56.1 Stmt. ¶¶ 37–38, 41–42.) "O" is Oprah Winfrey's nickname, and the team responsible for the creation of "O The Oprah Magazine" believed the magazine should incorporate this nickname in its title in order to capitalize on Ms. Winfrey's name recognition. (Defs.' Rule 56.1 Stmt. ¶ 43.) The desire to use the "O" in connection with Oprah Winfrey's magazine was motivated in part by the success of "Oprah's Book Club" which featured an oversized "O" logo on book jackets connected with the book club. (Defs.' Rule 56.1 Stmt. ¶ 47.) In order highlight the connection between "O" and "Oprah Winfrey," the magazine's title, "O The Oprah Magazine," was placed in the

upper-left hand corner of the magazine, with the letter "O" and the word "Oprah" in one color and "The" and "Magazine" in a different color. (Defs.' Rule 56.1 Stmt. ¶ 45.) Additionally, each issue of the magazine has, on its cover, a picture of Oprah Winfrey. (*Id.*)

The election of this cover design, including the title "O The Oprah Magazine", was announced on January 12, 2000. (Defs.' Rule 56.1 Stmt. ¶ 48.) This cover design, with the prominent "O", the title "The Oprah Magazine," with different coloring, along with a picture of Oprah Winfrey has appeared on each issue of "O The Oprah Magazine" that has been published. (Defs.' Rule 56.1 Stmt. ¶¶ 60–63.) Each issue of "O The Oprah Magazine" is focused on helping women live better lives, by focusing on their inner-self rather than on external, physical attributes; consequently, each issue contains a mission statement and the magazine is largely text-based and contains little content relating to sex and never contains erotic photographs. (Defs.' Rule 56.1 Stmt. ¶ 57.)

On February 11, 2000, the defendant Harpo filed Federal Trademark Application Serial No. 75/917,137 for the Mark "O THE OPRAH MAGAZINE" and the mark was ultimately identified for "Women's lifestyle magazines and newsletters covering 360 degrees of a woman's life, guided by the values of Oprah Winfrey." (Defs.' Rule 56.1 Stmt. ¶ 49.) The U.S. Patent and Trademark Office found no likelihood of confusion between the mark "O THE OPRAH MAGAZINE" and any pending or registered mark, including the plaintiff's <<O>> mark and issued a Notice of Allowance for Harpo's Trademark application on March 19, 2002. (Defs.' Rule 56.1 Stmt. ¶ 66.)

The premier issue of "O The Oprah Magazine" went on sale in April, 2000 and sold approximately 1.5 million copies. (Defs.' Rule 56.1 Stmt. ¶ 50.) Current audited figures reveal that "O The Oprah Magazine" has a total paid monthly circulation of approximately 2.75 million, with approximately 1 million sales occurring in retail outlets and 1.75 million subscription sales to consumers. (Defs.' Rule 56.1 Stmt. ¶ 51.) Of the 1 million monthly sales at retail stores, approximately 58% of those sales occur at supermarkets or at mass-market retail outlets such as Wal-Mart, which do not sell adult-oriented publications containing nudity. (Defs.' Rule 56.1 Stmt. ¶¶ 53–54.)

The defendants have never received any communication from any reader, advertiser or third party regarding the plaintiff's <<O>> Magazine, and have no knowledge of any instance of actual confusion. (Defs.' Rule 56.1 Stmt. ¶ 59.) The only incident of alleged actual confusion that the plaintiff has presented is a single e-mail in which the purchaser of a subscription to "O The Oprah Magazine" apparently contacted Mr. Brockmeyer about a problem with her subscription. There is no indication that the single e-mail writer ever saw Mr. Brockmeyer's magazine. (*See* Brockmeyer letter dated Oct. 17, 2002.)

In October, 2001, at a Tower Records store in suburban New York, Issue 27 of <<O>> Magazine was available in the "adult erotica" section of the store, near other adult titles, whereas, "O The Oprah Magazine" was sold some forty-five feet away in a section entitled "Woman's [sic] General Interest." (Defs.' Rule 56.1 Stmt. ¶ 19.) The relative cost of the two magazines is also markedly different, with the cover price of Issue 27 and Issue 28 of <<O>> Magazine at $12.95, and $9.95, respectively, while an issue of "O The Oprah Magazine" has a cover price of $3.50. (Defs.' Rule 56.1 Stmt. ¶¶ 16,21,52.)

The defendants also commissioned a market research study to determine

whether there was a likelihood of reverse consumer confusion between <<O>> Magazine and "O The Oprah Magazine." (Defs.' Rule 56.1 Stmt. ¶ 67.) The survey, was conducted by Dr. Henry Ostberg, a market researcher of the Admar Group, Inc., in shopping malls across the United States, and revealed that only 7 out of 255 respondents, or 2.7%, perceived any connection between the plaintiff's magazine and "O The Oprah Magazine." (Defs.' Rule 56.1 Stmt. ¶¶ 68–69,78.) Only 3 people, or 1.2%, of respondents believed that the <<O>> Magazine produced by the plaintiff was actually produced by any of the defendants or by Oprah Winfrey. (Defs.' Rule 56.1 Stmt. ¶ 74.) The survey was conducted under double-blind conditions, where neither the interviewer or the respondents were aware of the survey's sponsor and had no indication concerning an expected outcome, and it conformed to generally-accepted standards of professional market research. (Defs.' Rule 56.1 Stmt. ¶ 80–81.)

The plaintiff commenced this action on or about August 20, 2001.

### III.

■ The defendants first move to dismiss the plaintiff's claims under the Lanham Act. Section 32(1) of the Lanham Act provides protection against the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" and its application to "labels, signs, prints, packages, wrappers, receptacles or advertisements" where "such use is likely to cause confusion, or to cause mistake, or

to deceive." 15 U.S.C. § 1114(1). Section 43(a) protects both registered and unregistered marks against the use of any word, term, name, symbol or device that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...." 15 U.S.C. § 1125(a). Thus, "[i]n order to succeed a plaintiff does not have to show necessarily that consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff." *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996).

■ To establish a trademark infringement claim under either of these provisions, a plaintiff must show that it has a valid mark that is entitled to protection and that the defendant's actions are likely to cause confusion with the plaintiff's mark. *See The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 137 (2d. Cir.1999); *Time, Inc. v. Petersen Publ'g Co., L.L.C.*, 173 F.3d 113, 117 (2d Cir.1999); *Sports Auth.*, 89 F.3d at 960; *Cache, Inc. v. M.Z. Berger & Co.*, No. 99 Civ. 12320, 2001 WL 38283, at *3 (S.D.N.Y. Jan. 16, 2001).[1]

■ To survive a motion for summary judgment, the plaintiff must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of

---

1. The defendants have not contested the validity of the plaintiff's registered mark. According to Section 7(b) of the Lanham Act, a certificate of registration of a trade or service mark issued by the United States Patent and Trademark Office is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate...." 15 U.S.C. § 1057(b). Although the defendants challenged the validity of the mark on abandonment grounds in response to the plaintiff's motion for a preliminary injunction, they did not renew that argument in their summary judgment papers.

the defendant's mark," *Gruner + Jahr USA Publ'g. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993); *see also New York Stock Exch. v. New York, New York Hotel, LLC*, 293 F.3d 550, 554–55 (2d Cir. 2002); *Morningside Group*, 182 F.3d at 138; *Estee Lauder Inc. v. Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997); *Sports Auth.*, 89 F.3d at 960; *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390–91 (2d Cir.1995), "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the junior mark." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir.1996); *see also New York Stock Exch.*, 293 F.3d at 555; *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979). Proof of actual confusion is not necessary. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987). However, proof of actual confusion is probative of a likelihood of confusion. *See Morningside Group*, 182 F.3d at 141. The ultimate question as to the likelihood of confusion is a question of law for the Court. *See, e.g., Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 743 (2d Cir.1994).

■■■ The plaintiff alleged in his original complaint a likelihood of both forward confusion and reverse confusion. Forward confusion is the traditional form of confusion in which the junior user uses the mark to sell goods or services based on the misperception that they originate with the senior user. *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 740 (2d Cir. 1994); *Sunenblick v. Harrell*, 895 F.Supp. 616, 625 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684 (2d Cir.1996). "Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991); *see also Sterling*

*Drug*, 14 F.3d at 741; *Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 296 (S.D.N.Y. 2001); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 743 (S.D.N.Y.1997). Reverse confusion also "recognizes the danger that a junior user's products may tarnish the image of the senior user's products, or that consumers may view the senior user as an unauthorized infringer of the junior user's products, thus injuring the senior user's reputation and impairing its good will." *Becoming, Inc. v. Avon Products, Inc.*, No. 01 Civ. 5863, 2001 WL 930794, at *9 (S.D.N.Y. Aug. 15, 2001) (citations and punctuation omitted) (citing *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988) and *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003–04 (2d Cir.1983)); *see W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir.1993); *Sunenblick*, 895 F.Supp. at 625–26 (collecting cases).

■■■ In *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961), the Court of Appeals for the Second Circuit set forth eight non-exclusive factors that courts are to consider when determining whether a likelihood of confusion exists. Those factors are: 1) the strength of the plaintiff's mark; 2) the similarity of the plaintiff's and the defendants' marks; 3) the competitive proximity of the products; 4) the likelihood that the plaintiff will "bridge the gap" and offer a product like the defendants'; 5) actual confusion between products; 6) good faith on the defendants' part; 7) the quality of the defendants' product; and 8) the sophistication of buyers. *See Polaroid Corp.*, 287 F.2d at 495; *see also New York Stock Exch.*, 293 F.3d at 555; *Estee Lauder*, 108 F.3d at 1510; *Sports Auth.*, 89 F.3d at 960–65; *Hormel Foods*, 73 F.3d at 502–05. The decision as to whether a mark infringes requires a "comprehensive analysis of all

the relevant facts and circumstances." *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981). The Court of Appeals for the Second Circuit has instructed that:

> [T]he Polaroid factors are not, of course, "exclusive" and should not be applied "mechanically." No single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. But it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why. The steady application of Polaroid is critical to the proper development of trademark law, for it is only when the Polaroid factors are applied consistently and clearly over time that the relevant distinctions between different factual configurations can emerge.

*Arrow Fastener*, 59 F.3d at 400 (citations omitted); *see also New York Stock Exch.*, 293 F.3d at 555. When the likelihood of confusion is in doubt, the question will be resolved in favor of the senior user. *See Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 909 (3rd Cir.1952); *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 510 (E.D.N.Y.1975); *Lambert Pharmacal Co. v. Bolton Chem. Corp.*, 219 F. 325, 326 (S.D.N.Y.1915) (Hand, J.); *see also Cache*, 2001 WL 38283 at *5–6.

### (a)

The "strength" of a mark is a measure of " 'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.' " *Sports Auth.*, 89 F.3d at 960–61 (quoting *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)) (alteration in original). In gauging a mark's strength, a court must consider the inherent distinctiveness of the mark along with the mark's distinctiveness in the marketplace. *See Time*, 173 F.3d at 118; *W.W.W. Pharm.*, 984 F.2d at 572.

Four categories of marks indicate increasing inherent distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Estee Lauder*, 108 F.3d at 1508–09; *Sports Auth.*, 89 F.3d at 961. Arbitrary or fanciful are sometimes described as separate categories. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). "A generic term is a common name ... that describes a kind of product." *Gruner + Jahr*, 991 F.2d at 1075. A descriptive mark is "one that tells something about a product, its qualities, ingredients or characteristics." *Id.* at 1076. A suggestive mark suggests the product, though it may take imagination to grasp the nature of the product. *Id.* An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product; a fanciful mark is a made-up name. *See id.* at 1075–76; *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 515 (S.D.N.Y.1993). Classification of a mark is a question of fact. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992); *see also Cache*, 2001 WL 38283 at *4.

While the defendants, in their opposition to the plaintiff's motion for a preliminary injunction, originally contested whether <<O>> was an inherently distinctive mark, for the purposes of this motion they have conceded, in their reply brief, that <<O>> is a mark that is inherently distinctive.

Apart from the inherent distinctiveness of a mark, the Court must also consider the distinctiveness of the <<O>> mark in the marketplace. *See Oxford Indus., Inc. v. JBJ Fabrics, Inc.*, No. 84 Civ. 2505, 1988 WL 9959, at *4 (S.D.N.Y. Feb. 2, 1988) ("A mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks

significance in the market place for identifying the origin of goods."). The lack of commercial recognition of the plaintiff's mark demonstrates that the <<O>> mark is a weak mark. Only 8,290 copies of Issue 25, and 15,278 copies of Issue 26, were distributed in the United States. (Defs.' Rule 56.1 Stmt. ¶¶ 11–12.) Total sales amounted to 947 and 9,272 copies, respectively. (*Id.*) In addition, the plaintiff's magazine had not been published for nearly four years when the defendants released their magazine. There is evidence that, after "O The Oprah Magazine" was launched, the plaintiff distributed approximately 12,000 copies of Issue 27 and 13,500 copies of Issue 28 of his magazine, but there is no indication from the plaintiff as to the relative number of sales of those issues. There is a suggestion in the plaintiff's papers that the circulation of <<O>> Magazine has increased to 111,-000, but there is no evidence in the record to support this bare assertion. The extremely narrow distribution of the plaintiff's magazine and the length of time during which the magazine was absent from the marketplace suggests that even though the <<O>> mark is conceptually strong,

it is a weak mark overall. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985) (suggestive mark weak where magazine had been published for "only" five years, had distributed 150,000 copies in a previous year, and there was no evidence that the mark was associated in the public's mind with the magazine or its publisher). Moreover, the plaintiff has not submitted any evidence that consumers associate the <<O>> mark with his magazine, and this leaves the impression that the mark is virtually unknown in the commercial marketplace.

Because the evidence indicates that the plaintiff's mark is a weak one, this *Polaroid* factor weighs against him.[2]

(b)

In considering the degree of similarity between the marks, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they

---

2. Some opinions suggest that in a reverse confusion case, it is appropriate to consider the strength of the junior user's mark, because the essence of such a claim is that the junior user overpowers the senior user's mark. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir.2000); *Dreamwerks Prod., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n. 5 (9th Cir. 1998); *Sunenblick*, 895 F.Supp. at 627–28; J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition '23:10 (4th ed.); *see also Banff*, 841 F.2d at 491–92 (alluding to comparison of senior and junior user's marks in determining strength of senior user's mark); *but cf. W.W.W. Pharm.*, 984 F.2d at 573 (examining strength of senior user's mark in reverse confusion case, without discussing possibility that strength of junior user's mark is relevant); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F.Supp.2d 345, 351 (S.D.N.Y.2000) (same); *Columbia*, 964 F.Supp. at 744–45 (same).

While the plaintiff, in his motion for a preliminary injunction, did not dispute that the defendant's mark is a strong mark, in response to this motion he ironically disputes the strength of the defendant's mark by introducing an article by a self-described "authority on corporate nomenclature" entitled "O What a Branding Mistake" that disputes the strength of the defendants' mark. (See "From the Chicago Tribune" attached as Exh. 21 to decl. of Ronald B. Brockmeyer dated August 7, 2002). This article argues that the defendants' mark has very little weight. Given the acceptance of the defendants' mark in the marketplace and its inherent distinctiveness it is, however, best characterized as a strong mark. To the extent that it is necessary to include the strength of the defendants' mark in the calculus of *Polaroid* factors, it would not affect the ultimate conclusion as to the likelihood of consumer confusion.

are presented in the marketplace." *Sports Auth.*, 89 F.3d at 962 (citation omitted).

▇▇ The defendants' and the plaintiff's magazine both feature the letter "O" prominently on their covers, in a similar typeface and size. In addition, both magazines could be referred to verbally as "O Magazine" and the plaintiff's magazine uses an "O" without the words "The Oprah Magazine." (Defts.' Rule 56.1 Stmt. ¶ 7.) However, the plaintiff's publications do not use the letter "O" alone; it is always surrounded with guillemets so that it appears as <<O>> (as it does in the plaintiff's trademark registration). In addition, the <<O>> mark is centered on the cover of the plaintiff's magazine and appears in conjunction with a legend which, although there are some differences between issues, consistently invokes "fashion" and "fantasy." In contrast, the defendants place an "O" without guillemets, in the upper left-hand corner of the cover, where it is accompanied by the words "The Oprah Magazine" and the covers always depict Oprah Winfrey.

When viewed in context, the plaintiff's use of guillemets and the differences in cover layouts, photos, and legends tend to differentiate the marks when viewed in context. *See C.L.A.S.S.*, 753 F.2d at 18 n. 4 (differing layouts, design, legends, and logotype on magazine covers reduce the potential for confusion of the marks). The only common element of the marks used by the plaintiff and the defendants is the use of the letter "O". However, simply because they contain this common element does not mean that they are "similar" for the purpose of assessing confusion under the *Polaroid* factors. *See Lang*, 949 F.2d at 581–82. Additionally, the "O" in the defendants' magazine is a reference to Oprah Winfrey and her values, while the plaintiff's mark makes no reference to any particular personality, and only to the values associated with lesbianism, fetish cul-

ture, and sadomasochism. Therefore, the marks cannot be said to be similar for the purposes of confusion analysis and therefore this factor weighs in favor of the defendants.

(c)

▇▇ In considering the proximity of the products, a court should "consider whether the two products compete with each other." *W.W.W. Pharm.*, 984 F.2d at 573. The focus of the product proximity inquiry is "the likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves . . . ." *McGregor–Doniger*, 599 F.2d at 1134; *see also Arrow Fastener*, 59 F.3d at 396. In examining this factor a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others. *See Paco Sport*, 86 F.Supp.2d at 316. Editorial content is a relevant consideration when evaluating the proximity of publications. *See C.L.A.S.S.*, 753 F.2d at 18; *Inc. Publ'g Corp. v. Manhattan Mag., Inc.*, 616 F.Supp. 370, 385 (S.D.N.Y.1985).

▇▇ The publications at issue here differ greatly. The defendants' magazine targets a mass market, with a current circulation of 2.7 million copies. (Defs.' Rule 56.1 Stmt. ¶ 51.) The plaintiff has not shown any congruence between his magazine's audience and that of "O The Oprah Magazine." The <<O>> Magazine appeals to a niche market of readers interested in fetish culture and erotic photography, while "O The Oprah Magazine" appeals more generally to a broad spectrum of women interested in contemporary issues affecting the everyday lives of women. In addition, although some retail outlets might carry both magazines, the magazines are unlikely to appear in physical proximity to each other at such outlets. *See Sunenblick*, 895 F.Supp. at 629 (where

record labels had differing content, their products were likely to be sold in separate sections of record stores, making confusion unlikely.) Indeed, the defendants indicate that at one retail outlet in the New York suburban area where they could find both the plaintiff's and the defendants' magazines, the plaintiff's magazine was displayed some forty-five feet away from the defendants' magazine, in a different section of the store. (Defs.' Rule 56.1 Stmt. ¶ 19.)

Most importantly, the editorial content of the two magazines is completely dissimilar. The defendants' magazine is devoted to different aspects of women's lives, and its stated mission is to help women lead better lives and achieve a "sense of balance and wholeness" by focusing on the inner-self, rather than a woman's exterior. (Defs.' Rule 56.1 Stmt. ¶ 57.) The plaintiff's magazine consists largely of erotic and fetishistic imagery, together with some text relating to that imagery. It is virtually impossible to find even a single image or article from the plaintiff's magazine that would not be jarringly out of place in "O The Oprah Magazine", and vice versa. No ordinary prudent reader would view the contents of the magazine as similar and no reasonable reader seeking the contents of one magazine would turn to the other. It is plain that these two products do not compete with each other. The proximity factor weighs strongly in favor of the defendants.

(d)

■■■■ "Bridging the gap refers to the 'senior user's interest in preserving avenues of expansion and entering into related fields.'" *Hormel Foods*, 73 F.3d at 504 (quoting *C.L.A.S.S.*, 753 F.2d at 18). This factor involves a determination of the likelihood that the plaintiff will enter the defendants' business or of the average customer's perception that the plaintiff would enter the defendants' market. *See Sports*

*Auth.*, 89 F.3d at 963. "In the case of magazines, the senior user must present evidence that it intends to publish a magazine 'comparable' to that of the junior user." *Inc. Publ'g*, 616 F.Supp. at 385 (quoting *C.L.A.S.S.*, 753 F.2d at 18).

■■■■ The plaintiff has not presented evidence that he intends to publish a magazine comparable to "O The Oprah Magazine." In his motion for a preliminary injunction, at most, the plaintiff presented evidence suggesting that he intended to produce an art and fashion magazine for a more general audience. As noted in this Court's earlier opinion and order, an art and fashion magazine designed to appeal to the current readership of the plaintiff's magazine would still be a profoundly different magazine from the women's lifestyle magazine that the defendants publish. The plaintiff has provided no additional evidence to establish the likelihood that he will enter the defendants' business or that an average consumer would think it likely that he could do so. The plaintiff's most recent publication shows no resemblance to the defendants' magazine. Any future intention to bridge the gap is merely speculative. Thus, this factor weighs in favor of the defendants.

(e)

■■■■ "For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'" *Sports Auth.*, 89 F.3d at 963 (quoting *W.W.W. Pharm.*, 984 F.2d at 574 (quotation and citation omitted)). There is no evidence of any actual confusion in this case, and the plaintiff has not shown that he will likely be able to produce such evidence. The plaintiff, after briefing on the motion for summary judgment was completed, submitted a copy of email correspondence as evidence of actual confu-

sion between the defendants' magazine that that produced by the plaintiff. However, this email is not evidence of actual confusion. The author of the email letter, having already purchased a subscription of "O The Oprah Magazine" was writing to the plaintiff to complain about the fact that she had received two back copies of the magazine and to assure that her subscription would not run out earlier than she expected. The subscriber does not indicate that she received the plaintiff's magazine or confused it with the defendants' magazine. This is not evidence of consumer confusion, because the email's author was clearly aware of which magazine she intended to subscribe to, "O The Oprah Magazine," and she was expressing her dismay at receiving back issues of the magazine. In any event, this one anecdotal instance of purported actual confusion is at best de minimis, indeed infinitesimal, and insufficient to cause this factor to favor the plaintiff. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123–24 (2d Cir.2001).

Also, there is no evidence of any consumer confusion. The defendants commissioned a survey, which was performed in accordance with accepted market testing techniques. This survey revealed that fewer than 3% of respondents saw any connection between the plaintiff's magazine and that produced by the defendants. This rate of confusion is not sufficient to demonstrate a likelihood of confusion. *See Cumberland Packing Corp. v. Monsanto Co.,* 140 F.Supp.2d 241, 254 (E.D.N.Y.2001) (finding survey's confusion rate of 7.84% insufficient to raise material fact as to likelihood of consumer confusion); *cf. RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir.1979) (finding a consumer survey showing a fifteen to twenty percent rate of product confusion to be probative of a showing of confusion). In this case, given the widespread distribution of the defendants' magazine for over two years, the plaintiff had ample opportunity to come forward with evidence of actual confusion if there had been such confusion. The absence of such confusion weighs against the plaintiff. Therefore, this factor weighs in favor of the defendants.

(f)

 Bad faith is shown by demonstrating that the "defendants adopted [their] mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Arrow Fastener,* 59 F.3d at 397 (quoting *Lang,* 949 F.2d at 583) (punctuation omitted). The plaintiff argues that the defendants must have been attempting to trade on the plaintiff's reputation and goodwill when they chose the title of their magazine, but there is credible evidence that the defendants chose that title because of its relationship to Oprah Winfrey and because it tested well in focus groups. (Defs' Rule 56.1 Stmt. ¶ 44.) Given the limited circulation of the plaintiff's magazine and the fact that the magazine had not been published for years when the focus groups were consulted, it is highly improbable that the focus groups' opinions were shaped by any prior exposure to the plaintiff's mark. It is also difficult to conceive of why the defendants would have sought to capitalize on the plaintiff's reputation and goodwill when any reputation or goodwill the plaintiff might have had would have related to a market completely different from the one they were planning to enter. Moreover, the defendant performed a trademark search, and made a good faith determination using their mark in the way they sought to do so would not infringe any other mark. The defendants went forward with the publication of the magazine and sought to register their marks with the U.S. Patent and Trademark Office. The

fact that the USPTO approved the application to register "O The Oprah Magazine" mark without any reference or citation to the plaintiff's registration of the <<O>> mark supports the defendant's judgment. The plaintiff argues that the defendants must have acted in bad faith because the defendants were aware of the plaintiff's mark from their trademark registration search. The defendants are correct, however, that awareness of the plaintiff's mark does not mean that they acted in bad faith. Rather, the defendants reasonably concluded that there would be no confusion between their mark used as it would be used and the plaintiff's use of his mark, a conclusion eventually affirmed by the USPTO. *See, e.g., Arrow Fastener,* 59 F.3d at 397–98; *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,* 228 F.Supp.2d 399, 410 (S.D.N.Y.2002). There is no basis from which to infer any bad faith on the part of the defendants and therefore, this factor favors the defendants.

(g)

■■■ The analysis of the quality of the defendants' product "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener,* 59 F.3d at 398. In addition, if the plaintiff's goods and the defendants' goods are of comparable quality, that fact may increase the likelihood of confusion. *Morningside Group,* 182 F.3d at 142. The magazines at issue here are of comparable quality in terms of their paper, printing, and binding. This factor therefore slightly favors the plaintiff.

(h)

■■■ In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *McGregor–Doniger,* 599 F.2d at 1137 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed.1969)); *see also Sports Auth.,* 89 F.3d at 965; *W.W.W. Pharm.,* 984 F.2d at 575. In general, greater sophistication of consumers reduces the likelihood of confusion. *See Centaur Communications,* 830 F.2d at 1228. Magazines are, for the most part, relatively inexpensive products which may be purchased on impulse. *See Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.,* 687 F.2d 563, 566 (2d Cir.1982). The relatively high price of the plaintiff's magazine may mean that purchasers give more thought to purchasing that magazine, and therefore bring a higher level of sophistication to their purchase decision. The defendants' survey also confirms that because these magazines are of vastly different content, it is highly unlikely that any consumers, sophisticated or not, would be confused. The plaintiff has not come forward with any argument to counter the fact that sophisticated consumers who are willing to pay nearly ten dollars for the plaintiff's niche publication would be confused as between <<O>> magazine and the significantly less expensive "O The Oprah Magazine." This factor favors the defendants.

■■■ The Polaroid factors must be weighed as a whole and this process is not a "mechanical process." *Arrow Fastener,* 59 F.3d at 400; *see also Sports Auth.,* 89 F.3d at 965. There are, however, vast differences between the look and manner in which the plaintiff's mark and the defendants' mark are portrayed and and between plaintiff's magazine and the defendants' magazine in content and presentation. There is no indication that the defendant intends to, or is capable of,

bridging the gap between the publications. As a matter of law, there is no likelihood of confusion between the marks. The weak similarity of the marks when viewed in context, the lack of any evidence of actual confusion, and the lack of bad faith on the part of the defendants bolsters this conclusion. Virtually all of the *Polaroid* factors favor the defendants, and it is unlikely that the use of the letter "O" by the defendants in "O The Oprah Magazine" will cause either forward or reverse confusion between the plaintiff's and the defendants' marks. Consequently, the defendants' motion for summary judgment on the plaintiff's claims under Sections 32(1) and 43(a) of the Lanham Act (15 U.S.C. §§ 1114(1) & 1125(a)) is granted.

### IV.

■ The defendants also move for summary judgment on the plaintiff's unfair competition claim. With regard to the plaintiff's unfair competition claim, under New York Law, "the essence of unfair competition... is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 249–50 (S.D.N.Y.) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987) *aff'd* 923 F.2d 845 (2d Cir. 1990)); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.,* 858 F.Supp. 1268, 1278 (S.D.N.Y.1994). The plaintiff's unfair competition claim must also fail. As explained above, there is no evidence to suggest that the defendant acted in bad faith or with the intention of misappropriating any good will built up by the plaintiff through the use of the mark <<O>> in connection with <<O>> magazine. Moreover, there is no

likelihood of confusion between the marks, which would be a prerequisite for this claim. *Jeffrey Milstein Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34–35 (2d Cir.1995). The defendants' motion for summary judgment on this claim is granted.

### V.

■ The defendants also move for summary judgment on the plaintiff's claim alleging trademark dilution under N.Y. General Business Law § 360–*l*, which provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360–*l* (formerly N.Y. Gen. Bus. Law § 368–d). To state a claim under § 360–*l* a plaintiff must show: (1) that the plaintiff's mark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of "blurring" or "tarnishment." *U–Neek, Inc. v. Wal–Mart Stores, Inc.,* 147 F.Supp.2d 158, 175 (S.D.N.Y.2001). The analysis under § 360–*l* is generally similar to the analysis under Section 43(c) of the Lanham Act. *See Fed. Express Corp. v. Fed. Espresso Inc.,* 201 F.3d 168, 174–75 (2d Cir.2000).

■ The plaintiff cannot establish either that he is the owner of a distinctive mark or that his mark has obtained a secondary meaning. The determination whether a mark is famous and distinctive under § 43(c) is similar to the analysis for strength of the mark for trademark infringement purposes. *Cf. Mead Data Cen-*

tral, Inc. v. Toyota Motor Sales, U.S.A. Inc., 875 F.2d 1026, 1030 (2d Cir.1989) ("Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes.") As explained earlier, the plaintiff's mark is a weak mark, has little commercial recognition, lacks distinctive qualities, and has little or no conceptual strength. Therefore, the mark cannot qualify as a truly distinctive mark. Moreover, the plaintiff has not come forward with any proof that the <<O>> mark has obtained secondary meaning. The plaintiff, therefore, cannot maintain a dilution claim. See, e.g., Christopher D. Smithers Found. v. St. Luke's Roosevelt Hosp. Center, No. 00 Civ. 5502, 2003 WL 115234, at *5–*6 (S.D.N.Y. Jan. 13, 2003); Greenpoint Fin. Corp. v. Sperry & Hutchinson Co., Inc., 116 F.Supp.2d 405, 413 (S.D.N.Y.2000).

▬▬▬ In any event, there is also no evidence in the record of any blurring or tarnishment. Blurring is the "process that may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Fed. Express Corp.,* 201 F.3d at 175 (quotations omitted) (emphasis in original). There is no allegation that the defendants used the plaintiff's mark to identify "O The Oprah Magazine," or that the use of "O" in "O The Oprah Magazine" would prevent the <<O>> mark from identifying the plaintiff's magazine. Consequently there is no possibility of blurring in this case. On the other hand, tarnishment exists when the plaintiff's mark is " 'linked to products of shoddy quality or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.' " *U–Neek,* 147 F.Supp.2d at 175 (quoting *Deere & Co. v. MTD Prods.,*

Inc., 41 F.3d 39, 43 (2d Cir.1994)). As noted earlier, the defendants' magazine is not a product of shoddy quality—it is a renowned magazine associated with a famous personality and has a wide distribution and readership. Nor can it be said that the defendants' magazine is "unwholesome" or "unsavory." Quite the opposite is true. So it cannot be said that the association of the plaintiff's mark with the defendants' magazine would tarnish the plaintiff's mark in any way.

Because the plaintiff's claim does not satisfy the element's of a dilution claim, the defendants' motion for summary judgment on the plaintiff's New York state law claim for dilution is granted.

## CONCLUSION

The defendants' motion for summary judgment is granted with respect to all of the plaintiff's claims. Consequently, the plaintiff's claims are dismissed.

Because the defendants have not moved for their summary judgment on their counterclaim seeking a declaratory judgment canceling the plaintiff's trademark <<O>> pursuant to 15 U.S.C. § 1119, final judgment in this case cannot be entered. The parties are directed to follow the scheduling order in place for the continuing disposition of this case.

**SO ORDERED**.