**SLY MAGAZINE, LLC, Plaintiff,**

v.

**WEIDER PUBLICATIONS L.L.C. and American Media, Inc., Defendants.**

No. 05–Civ–3940 (CM).

United States District Court, S.D. New York.

Dec. 18, 2007.

John P. Bostany, Andrew T. Sweeney, The Bostany Law Firm, New York, NY for plaintiff.

Susan J. Kohlmann, Elizabeth Valentina, Jenner & Block LLC, New York, NY for defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COLLEEN McMAHON, District Judge.

This is a trademark infringement action brought by the plaintiff, SLY Magazine,

LLC, alleging that the publishers of the print "SLY" magazine, Weider Publications LLC and American Media, Inc. (collectively the "defendants"), infringed on plaintiff's unregistered mark "SLY," the title of its online magazine, in violation of the Lanham Act,[1] New York common law, and the New York Anti–Dilution Statute, N.Y. Gen Bus. Law § 360–1.[2] Plaintiff seeks damages in connection with defendants use of the word "SLY" to identify their now-defunct magazine, as well as an injunction against future use.

This case was formerly assigned to the late Judge Richard Conway Casey, who denied plaintiff's application for a Temporary Restraining Order on December 12, 2005 and denied plaintiff's subsequent motion for Preliminary Injunction on December 27, 2005. This case was reassigned to me on May 18, 2007.

Defendants now move for summary judgment. The crux of this case is whether there is any likelihood of consumer confusion. Because plaintiff has not raised a genuine issue of fact as to this issue, defendants' motion is GRANTED.

### FACTS

There is no genuine dispute about the following material facts.

#### A. The parties

Defendants are a limited liability company and a Delaware corporation. (Defs.' Rule 56.1 Stmt. ¶ 1.) Defendant American Media's principal place of business is in New York, and defendant Weider Publica-

tions L.L.C.'s principal place of business is in California. (Compl.¶¶ 2, 3.) They are both in the business of magazine publishing. (*Id.*) Defendants publish more than thirty magazines, including Celebrity Living Weekly, Star Magazine, and The National Enquirer. (*Id.* ¶ 2.)

Plaintiff SLY Magazine LLC is a New York limited liability corporation, with a principal place of business in New York. It maintains and operates a website at www. slymagazine.com and the "online magazine" at that website it calls "Sly." (*Id.* ¶ 3.)

#### B. The publication of defendants' SLY magazine

Sylvester Stallone, who has been known by the nickname "Sly" since in or about 1976 (the year the first *Rocky* movie was released) is a public figure (*Id.* ¶ 4.) Over a period of more than three decades, Mr. Stallone has starred or appeared in 52 films, has made more than 90 television guest appearances, including personal interviews on nearly every major news program. (*Id.* ¶ 6.) His name and public image, personified by his best-known characters, "Rambo" and "Rocky Balboa", evoke masculinity, physical fitness, and a general "tough guy" image for millions of fans around the world. (*Id.* ¶¶ 4, 5.)

Mr. Stallone, together with defendants, developed a test magazine to appeal to the demographic that Mr. Stallone most embodies: fit men over 40, with an interest in physical fitness and an active lifestyle. (*Id.* ¶ 8.)[3] Defendants and Stallone signed

---

1. After plaintiff acquired a registered trademark for "SLY," plaintiff sought leave to amend its complaint to add a new Lanham Act claim against defendants for infringement of its newly registered mark. The Court (Preska, J.) denied plaintiff's motion because the law does not permit direct liability based

upon retroactive registration. (4/9/07 Order at 7–8.)

2. On July 18, 2007, the parties stipulated to a dismissal of the federal trademark dilution claim with prejudice and without costs.

3. The magazine appears to have much in common with a magazine called "O, The Op-

the SLY Magazine Test Agreement on or about August 28, 2004, and developed the first issue of the magazine. (*Id.* ¶ 9.)

As part of the agreement, Stallone provided defendants with a license to use Stallone's "attributes," including his name, likeness and identity. (*Id.* ¶ 10.) However, Mr. Stallone did not publish, print, disseminate, sell or buy defendants' magazine. (Pl. Rule 56.1 Stmt. ¶¶ 8, 9.) He is, therefore, not a defendant in this action.

Defendants began promoting their SLY Magazine in or about September 2004. (Defs.' Rule 56.1 Stmt ¶ 11.) These promotions were in the form of press releases to various media outlets and contacts with advertisers. (*Id.*) In addition, defendants held four press events 30 days prior to the on sale date of each issue. (*Id.* ¶ 12.)

Defendants' first issue of SLY had an "on sale" [4] date of February 14, 2005, and a cover date of March 2005. (*Id.* ¶ 13.) Defendants' second issue of SLY had an on sale date of May 9, 2005, and a cover date of May/June 2005. Their third issue had an on sale date of July 25, 2005, and a cover date of July/August 2005. (*Id.* ¶ 14.) Defendants' final issue of SLY, the December/January 2006 issue, had an on sale date of December 26, 2005. (*Id.* ¶ 15.) Defendants' SLY magazine remained on sale until at least March 26, 2006. (4/9/07 Order at 3.) Defendants have ceased to publish this title. (*Id.* ¶ 17.)

Defendants used SLY as the nickname for its creator and editorial director, Sylvester Stallone, and SLY was always shown in imposing block capital letters on its magazine. (*Id.* ¶ 18.) Mr. Stallone himself appeared on the first two covers,

with the premier issue including features like, "Sly Has Dinner with James Caan," in which Mr. Stallone transcribed his dinner conversation with his friend and fellow actor, "Sly's Picks" in which Mr. Stallone reviewed movies recently released on DVD, an electronics review titled "Sly Stuff," and "The Sly Review" where Mr. Stallone interviews a woman described as "the first lady of porn." (*Id.* ¶ 19.) The final issue of Defendants' SLY listed the following featured articles on its cover: "5 Ways to Keep Her Happier at Home," "Babes in the USA: The 40 Hottest Women Over 40," "How to Muscle Up at Any Age: the Sly No–Fail Plan!" and "Go From Seriously Soft to Seriously Fit: One Man's Success Story." (*Id.* ¶ 20.) It also featured articles on Turks and Caicos, "The Year in Movies," "Must Reads," "Seven Foods You Never Knew Could Make you Fat," and "Trail Blazers." (Pl. Rule 56.1 Stmt.)

### C. Plaintiff's SLY magazine[5]

Plaintiff's limited liability corporation was formed on or about May of 2004. (*Id.* ¶ 21.) On or about June 30, 2003, plaintiff purchased the domain name at www.slymagazine.com (the "Plaintiffs Website"). (*Id.* ¶ 22.) Plaintiff launched a website on or about November 1, 2004 (*id.* ¶ 23), but announcements of plaintiffs online magazine appeared on the Internet as early as February 2004. (Pl. Rule 56.1 Stmt. ¶ 23.)

Plaintiff discussed several names, including "Fierce," but ultimately decided on "Sly." (*Id.* ¶ 26.) At the preliminary injunction hearing, Judge Casey found that plaintiff knew or should have known that

---

rah Magazine," which promotes and is promoted by another celebrity, Oprah Winfrey.

**4.** The on sale date is the target date by which all issues of the magazine should be on sale. (*Id.* ¶ 16.)

**5.** Plaintiff's "SLY" magazine refers to plaintiff's online publication.

Mr. Stallone is known as "Sly." (*Id.* ¶ 28; P.I. Tr. at 36.)

Invitations to the November 4, 2004 launch party for plaintiff's online magazine featured a "Designer Shoe Give Away" as a part of the event. (Defs.' Rule 56.1 Stmt ¶ 24.) As of December 17, 2007, plaintiff's website was re-titled "Sly ... shoes, the obsession." The new name appeared in a stylized italicized script.

Plaintiff cannot determine how much money it spent on advertisements and promotions. (Pl. Opp. at 10.) However, plaintiff hosted a shoe sale promotional event (Raps Decl. Exs. 21, 22), listed its contact information in Bacon's New York Publicity Outlets 2005 listing (Raps Decl. Ex. 24), received five testimonials praising its website (Raps Decl. Ex. 25), received approximately 71 website feedback survey responses dated from November 4, 2004 through November 25, 2005 (Raps.Decl.Ex. 27), and received invitations to approximately eighteen fashion/art industry events (Raps.Decl.Ex. 26).

On January 9, 2006, plaintiff's Editor-in–Chief testified that it had not yet published a print magazine, and the earliest it was scheduled to appear on newsstands was July 2006. (*Id.* ¶ 29.) On January 11, 2006, plaintiff's publisher testified that there was no print magazine. (*Id.* ¶ 30.) Plaintiff did not publish a print magazine at any time while Defendants' magazine was on newsstands, and according to the record it has not ever published a print magazine. (*Id.* ¶ 31.) However, plaintiff plans to do so, and claims it has already received at least 81 subscriptions for its print magazine. (Pl. Rule 56.1 Stmt. ¶ 31; Raps Decl. Ex. 28.) As Judge Casey aptly noted when he denied the motion for a preliminary injunction, defendants' and plaintiff's products will never appear side-by-side on the shelf in a newsstand, because defendants no longer publish and plaintiff has yet to publish. (*Id.* ¶ 32; P.I. Tr. at 33.)

### D. Plaintiff's market

Plaintiff's marketing materials describe plaintiff's target market as follows: "Sly is for the quintessential woman—independent and charming. Sly bridges the gap between beauty and wit because the two are never separate when discussing the beauty of women. Sly women." (*Id.* ¶ 33.) The internet pages displayed at plaintiff's website in December 2005 show that the tagline for the site is "Shoes ... the Obsession." A woman's shoe is prominently depicted. Plaintiff features a column called "On Your Feet" and a department with a display of shoes called "Shoe Space." (*Id.* ¶ 38.) Other advertisements and brief editorial pieces bear leads like "Diamonds are a girl's best friend and they're making a comeback" and "Bohemian chic dominated the runways at New York's fashion week. Here's a sneak peak of what to expect this fall." These and other items targeted a fashion- or city-based female audience. (*Id.* ¶ 34.) Plaintiff's online magazine also reports on lifestyle issues, such as career advancement and electronics, and is not limited to fashion and shoes. (Pl. Rule 56.1 Stmt. ¶¶ 33, 34, 39.)

Plaintiff's online magazine is focused toward women living in metropolitan areas. (PL Rule 56.1 Stmt. ¶ 35.) The demographic for plaintiff's publication is women thirty-five and under, who are single, with a college degree, and earn above $40,000 a year. (Defs.' Rule 56.1 Stmt. ¶ 36.) Plaintiff describes its product as "an invaluable resource to the upper echelon of lifestyle marketers who rely on the tastes of popular trendsetters to help define their business objectives. Sly provides coverage on *[sic]* the leading issues of *[sic]* which wom-

en have an opinion; speaking to women as no other has." (*Id.* ¶ 37.)

Plaintiff's profile describes that it will cover, "High-end shoe designs and accessories" and "Shoe shopping with celebrities and lifestyle trends." (*Id.* ¶ 39.) Plaintiff has an ad depicting the word SLY where the "L" is in the shape of a boot, and the words "the obsession" appearing underneath. (*Id.* ¶ 40.) Plaintiff's website lists a MySpace link, which also references "shoes": myspace.com/slymagazine_shoes.[6] Plaintiff indicates: "Sly will not discuss relationships in a manner where women are held to be the victims and men are both the center of their universe and the root of all their issues. Band [sic] from our pages are *How to* ... or *10 Ways* ...." (*Id.* ¶ 41.)[7]

### E. Plaintiff's trademark

Plaintiff's trademark registration No. 3,045,096 for SLY was issued on January 17, 2006. (*Id.* ¶ 43.) First use of the mark was on 6/30/2003 and first use in commerce was on 11/02/2004 in connection with Class 16 goods, "printed publications." (*Id.*)

The Examiner noted in an Office Action that plaintiff must revise its goods identification to select one or both of Class 16 (for printed publications) or Class 41 (for providing online magazines). (*Id.* ¶ 44.) Surprisingly, given the existence of its web magazine and the non-existence of its print magazine, plaintiff responded to the Office Action by deleting references to "online" and "websites" and maintaining only Class 16 printed publications. (*Id.* ¶ 45.)

### G. Instances of confusion

Plaintiff first learned about defendants' SLY Magazine at least as early as October 25, 2004, when its website, info@ slymagazine.com, received an email with the following inquiry, "I am aware that Sylvester Stallone's magazine will be hitting the newsstands sometime in January 2005. Will this magazine deal with products for men to purchase other than nutritional products or body building equipment?" (Sweeney Decl. Ex. 34.)[8]

Plaintiff received several other emails intended for or referencing defendants' publication. Plaintiff received nearly 100 emails dated between November 23, 2004 and September 6, 2005 written to plaintiff asking for subscriptions to defendants' SLY magazine. (Sweeney Decl. Ex. 32.) Plaintiff subsequently received seven emails commenting on articles in defendants' publication. (Sweeney Decl. Ex. 33.) Approximately eighteen emails were sent to plaintiff requesting a business relationship with defendants.

Plaintiff received eleven emails between February 8, 2005 and March 14, 2005 from consumers who thought they were rating defendants' publication. (Sweeney Decl. Ex. 35.) Ford Motor Company, which was in negotiations with defendants to be an advertiser in defendants' SLY publication, mistakenly sent a camera ready advertisement addressed to defendant "SLY American Media Inc" to plaintiff. (Sweeney Decl. Ex. 30.)

Finally, defendants' March 2005 issue of SLY contained the following statement by a reader: "I did a Web search for *Sly*

---

**6.** The MySpace link was posted on plaintiff's website as of December 17, 2007.

**7.** I assume this refers to features like "How to Find a Man" or "10 Ways to Please Your Lover," which can be found in other women's magazines, like *Cosmopolitan*.

**8.** Plaintiff also received a large number of spam emails for products like "male enhancement" formulas and erectile dysfunction pills.

magazine and was shocked to discover it's a publication about women's shoes ... has Stallone gone soft? Does he have a love for women's footwear that his fans never knew about?" (Sweeney Decl. Ex. 31.) Defendants responded, "We didn't mean to confuse you. There is another Sly Magazine, but trust us, the name is where the similarities end...." (*Id.*)

### H. Plaintiff's demand letter and prior proceedings

Plaintiff sent a cease and desist letter to a principal of defendant American Media, Inc., on or about January 12, 2005, prior to the appearance of defendants' magazine on the newsstands. (*Id.* ¶ 50.) Plaintiff filed its Complaint on or about April 19, 2005. (*Id.* 152.) Judge Casey denied plaintiff's application for a Temporary Restraining Order on December 12, 2005. (*Id.* ¶ 53.) On December 27, 2005, Judge Casey denied plaintiff's application for a preliminary injunction in its entirety. (P.I. Tr. at 39.) In ruling for defendants, Judge Casey expressly adopted their arguments in opposition to plaintiff's application for a preliminary injunction. These arguments included the following: (1) plaintiff did not show irreparable harm because defendants' last issue was then on the newsstands and defendants' counsel stated that defendants would not publish any more issues (P.I. Tr. at 39); (2) plaintiff did not demonstrate a likelihood of success on the merits, because plaintiff did not demonstrate a likelihood of confusion. (*Id.* ¶ 54.)

Discovery was completed on January 31, 2006. (*Id.* ¶ 55.) On April 9, 2007, the Court denied plaintiffs motion for leave to file an amended complaint. (*Id.* ¶ 56.)

*DISCUSSION*

### I. Standard of Review

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 322–33, 106 S.Ct. 2548. On a motion for summary judgment, the court views the record in the light most favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir.1987).

### II. Lanham Act Claims

Plaintiff brings this action alleging trade dress infringement [9] and unfair competition of its unregistered mark "SLY" under Section 43 of the Lanham Act. Section 43 of the Lanham act prohibits the use "in commerce" of any:

word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading

---

9. Plaintiff refers to its mark "Sly" as both a "trade dress" and a "trademark." (*See* Compl. ¶¶ 7, 8, 9.) The standard of proof for trademark infringement applies equally to claims of trade name and trade dress infringe-

ment. *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 579 (2d Cir.1991); *Patsy's Brand Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir.2003).

representation of fact ... which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. 1125(a) (2006).

To prevail on its Lanham Act claims, the plaintiff must demonstrate "that is has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993). The test is the same for registered and unregistered marks. *Virgin Enters., Ltd. v. Nawab, et al.,* 335 F.3d 141, 146 (2d Cir.2003).

In this case, plaintiff has a valid mark entitled to protection. "A magazine title may give rise to a protectable trademark." *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 376 (S.D.N.Y.1985); *see also C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14 (2d Cir.1985).

It is also undisputed that plaintiff was the first user of the mark "SLY" as the title of a magazine. Defendants cite no case law to support their position that simply because Mr. Stallone has used the nickname "Sly" since 1976, defendants are the senior user of the name "Sly." While celebrities certainly have a right to use their nicknames in commerce, here, as defendants admit, plaintiff uses the name "SLY" for an internet publication unrelated to Mr. Stallone before defendants used the name "Sly" in connection with any publication. Plaintiff has also registered its mark with the U.S. Patent and Trademark Office. Consequently, plaintiff is the senior user.

The outcome here thus hinges on the issue of the likelihood of customer confusion. "The ultimate question as to the likelihood of confusion is a question of law for the Court." *Brockmeyer v. Hearst Corp.,* 248 F.Supp.2d 281, 293 (S.D.N.Y. 2003). Although the existence of a likelihood of confusion may involve a series of inferences, summary judgment may nonetheless be appropriate where a plaintiff fails to raise of genuine issue of material fact on the issue of a likelihood of consumer confusion. *Lang,* 949 F.2d at 580; *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 115 (2d Cir.1984); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir.1986); *Murphy v. Provident Mutual Life Ins. Co.,* 923 F.2d 923, 930 (2d Cir.1990), *cert denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991).

For plaintiff to prevail, "a probability of confusion, not a mere possibility, must exist." *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir. 1998) (citing *Gruner + Jahr,* 991 F.2d at 1077; *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997)). "A probability of confusion may be found when a *large* number of purchasers likely will be confused as to the source of the goods in question." *Streetwise,* 159 F.3d at 743 (emphasis added).

This case involves allegations of reverse confusion. "Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang.* 949 F.2d at 583; *see also Brockmeyer,* 248 F.Supp.2d at 293. Reverse confusion "recognizes the danger that a junior user's products may tarnish the image of the senior user's products or that consumers may view the senior user as an unau-

thorized infringer of the junior user's products, thus injuring the senior user's reputation and impairing its good will." *Becoming, Inc. v. Avon Prods., Inc.,* 2001 WL 930794, at *9 (S.D.N.Y. Aug.15, 2001) (citations and punctuation omitted).

▆▆▆ To determine whether plaintiff has raised a genuine issue of fact on the issue of the likelihood of confusion, courts in this Circuit apply the eight-factor test first set forth in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961); *see also Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158, 162 (2d Cir.2004). These factors are:

(1) the strength of the plaintiff's mark;

(2) the similarity of the parties' marks;

(3) the proximity of the parties' products in the marketplace;

(4) the likelihood that the plaintiff will "bridge the gap" between the products;

(5) actual customer confusion between the two marks;

(6) the defendant's intent in adopting its mark;

(7) the quality of the defendant's product; and

(8) the sophistication of the relevant consumer group.

*Id.* In balancing these factors, a court should not treat any one factor as dispositive; neither should it apply the test in a rote fashion such that the party with the greatest number of factors wins. *Natural Organics, Inc. v. Nutraceutical Corp.,* 426 F.3d 576, 578 (2d Cir.2005); *Playtex,* 390 F.3d at 162. "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." *Playtex,* 390 F.3d at 162.

### A. Review of the Polaroid factors

### 1. Strength of the mark

▆▆▆ This factor "focuses on 'the distinctiveness of the mark, or more pre-

cisely, its tendency to identify the goods' as coming from a particular source." *Lang,* 949 F.2d at 581 (quoting *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). "To gauge a mark's strength, we consider two factors: its inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise,* 159 F.3d at 743. In assessing the former, "courts classify it in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary." *Id.* at 744 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)) (Friendly, J.). With respect to the latter, courts consider: "(i) plaintiff's advertising expenditures; (ii) consumer surveys linking the trade dress to a particular source; (iii) sales success; (iv) unsolicited media coverage; (v) attempts to plagiarize the trade dress; and (vi) the length and exclusivity of the use." *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1536 (2d Cir.1992).

Defendants do not contest the classification of plaintiff's mark as inherently distinctive and arbitrary. The word "SLY" is not a generic term and does not suggest or describe plaintiffs fashion/lifestyle magazine in any way.

▆▆▆ However, arbitrariness does not guarantee a determination that the mark is a strong one. "A mark may be categorized as arbitrary or fanciful, but may nonetheless lack commercial strength in the marketplace and therefore ultimately be deemed weak." *Dana Braun, Inc. v. SML Sport Ltd.,* 2003 WL 22832265, at *9 (S.D.N.Y. Nov.25, 2003) (citing *Mondo, Inc. v. Sirco Int'l Corp.,* 1998 WL 849401, at *5–6 (S.D.N.Y.Dec.7, 1998); *Oxford Indus., Inc. v. JBJ Fabrics, Inc.,* 6 U.S.P.Q.2d 1756, 1760 (S.D.N.Y.1988) (citing *Playboy Enters. v. Chuckleberry Pub.,*

*Inc.,* 486 F.Supp. 414, 420 (2d Cir.1980))); *see also Lang,* 949 F.2d at 581.

■■■ "SLY," at least as used by plaintiff, is not particularly distinctive in the marketplace. Although plaintiff has provided a few examples of promotional activity, plaintiff documents no advertising expenditures, has produced only a few documents showing third party press coverage of its launch, and has produced no evidence of any advertising sold on its website. Indeed, plaintiff has not produced any evidence of revenue at all. Plaintiff has not yet created a print magazine, so it cannot fill the 81 subscriptions it claims to have received.

The website feedback survey responses received by plaintiff between November 4, 2004 through November 25, 2005 do not indicate that consumers associate the "SLY" mark with plaintiff's magazine, or that plaintiff's mark in known in the marketplace. (Raps.Decl.Ex.27) Rather, they indicate that "Sly" is associated in the minds of the sender with Mr. Stallone and suggest that plaintiff's mark does not enjoy widespread commercial recognition. Nor does the receipt of eighteen invitations to certain art and fashion-related industry events demonstrate that plaintiff's mark is known in the marketplace and is associated with plaintiff.

Of course, the essence of plaintiff s reverse confusion claim is that the junior user (Mr. Stallone's magazine) overpowers the senior user's mark. Were I to consider the strength of defendants' (the junior users') mark, as courts sometimes do when reverse confusion is alleged, this factor would still weigh in defendants' favor. *See, e.g., Brockmeyer,* 248 F.Supp.2d at 295 n. 2. The strength of the association between "SLY" and Mr. Stallone stems, not from defendants' penetration into the magazine market, but from the very famous Mr. Stallone and his long use of this nickname. Plaintiff, to its own detriment, chose the well-known nickname of a world-famous actor as the mark for its publication. Plaintiff knew or should have known that Mr. Stallone is known as "Sly" and that the marketplace might associate the word "Sly" with Mr. Stallone, instead of a women's magazine. (Defs.' Rule 56.1 Stmt. ¶ 28.)

So while plaintiff's mark is arbitrary because of its inherent distinctiveness, the lack of evidence that there is widespread commercial recognition of the plaintiff's mark demonstrates that the "SLY" mark is a weak mark. *See Brockmeyer,* 248 F.Supp.2d at 295. This *Polaroid* factor favors the defendants.

### 2. The similarity of the two marks

■■■ In determining whether the two marks are similar, and thus likely to provoke confusion among prospective purchasers, a court should look at the "the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr,* 991 F.2d at 1078; *see also Streetwise,* 159 F.3d at 744. "In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *The Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 962 (2d Cir.1996).

Judge Koeltl's decision in *Brockmeyer v. Hearst Corp.* is particularly instructive. In *Brockmeyer,* the plaintiff alleged that the publishers and distributors of "O The Oprah Magazine" infringed on the registered trademark held by the plaintiff, "≫O≪." 248 F.Supp.2d 281. The court found that, while defendants' and the plaintiffs magazine both featured the letter

"O" prominently on their covers, in similar typeface and size, the "plaintiff's use of guillements and the differences in cover layouts, photos and legends tend to differentiate the marks when viewed in context." *Id.* at 296. Additionally, the court found that the "O" in the defendants' magazine referenced Oprah Winfrey and her values, while the plaintiff's mark made no reference to any particular personality, but only to the values associated with lesbianism, fetish culture, and sadomasochism.[10]

 Here, both plaintiff and defendants use the word "SLY." However, this fact alone does not make the marks similar for purposes of assessing confusion under this *Polaroid* factor. *Id.* at 296. Defendants' "SLY" was always shown in block capital letters, (Defs.' Rule 56.1 Stmt ¶ 18), whereas plaintiff often uses the mark in a "feminine" italicized script or followed by the tagline "Shoes ... the Obsession." (R. Charles Decl., Exs. P, N–SJK Ex. 14, 12.) When viewed in context, the plaintiff's use of italicized script and the frequent addition of a tagline ("Shoes ... the obsession") tend to differentiate the marks. *See Brockmeyer,* 248 F.Supp.2d at 296.

Additionally, defendants' use of "SLY," like the defendants' use of "O" in *Brockmeyer,* connotes the values, image, and persona of the namesake of the magazine (Mr. Stallone and Oprah Winfrey, respectively). *See id.* Plaintiff's "SLY," like the plaintiff's "<<O>>" in *Brockmeyer,* references no particular personality, but rather refers to the values associated with fashion and style. *See id.*

Thus, the marks are not similar for purposes of confusion analysis and this factor weighs in favor of the defendants.

10. The plaintiff's magazine focuses on erotica and sadomasichism, and adopts as its moniker the "non-name" of the heroine of a famous

### 3. *Proximity of the products*

 This factor focuses on the extent to which the two products compete with each other. *Lang,* 949 F.2d at 582. The inquiry centers on the "likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves...." *McGregor–Doniger,* 599 F.2d at 1134. "[A] court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels," as well as "editorial content." *Brockmeyer* 248 F.Supp.2d at 296.

 Here, the publications did not compete. Defendants' magazine was a print publication, while plaintiff's appeared only on the internet. Defendants' print magazine catered, during its brief life, to the interests of men over forty, whereas plaintiff's online magazine targets younger women living in metropolitan areas. *See Lang,* 949 F.2d at 582. As the undisputed facts demonstrate, the two publications carried completely different stories that catered to different people and interests.

Most important, plaintiff has never published a print magazine and defendants' magazine is now defunct. The parties' products will never appear side-by-side on the newsstand, so there will be nothing to confuse (Defs.' Rule 56.1 Stmt. ¶ 32.)

### 4. *Bridging the gap*

 This factor focuses on the likelihood that plaintiff will enter defendants' market. "In the case of magazines, the senior user must present evidence that it intends to publish a magazine 'comparable' to that of the junior user." *Brockmeyer,* 248 F.Supp.2d at 297 (quoting *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.,* 616

pornographic novel. *See* Pauline Réage, *Histoire d'O* (The Story of O) (1954).

F.Supp. 370, 385 (S.D.N.Y.1985)). Furthermore, even if plaintiff were to publish a print magazine (and this is wholly speculative), plaintiff has no plans to modify the magazine to target the interests of 40+ men. Therefore, it does not "bridge the gap," *See Lang,* 949 F.2d at 582; *Brockmeyer,* 248 F.Supp.2d at 297. Furthermore, "the intent of the prior user to expand its activities in preparation to do so, *unless known by prospective purchasers,* does not affect the likelihood of confusion." *Lang,* 949 F.2d at 582 (quoting *Restatement,* § 21 reporter's note at 210) (emphasis in original). Plaintiff has provided no evidence that prospective purchasers are assuming that plaintiff will publish a print magazine aimed at defendants' target audience. This factor weighs in favor of the defendants.

### 5. Actual confusion

In this case, there have been instances of actual confusion. Plaintiff received nearly 100 emails requesting subscriptions to defendants' magazine (Sweeney Decl. Ex. 32), seven emails commenting on articles in defendants' publication (Sweeney Decl. Ex. 33), and approximately eighteen emails seeking a business relationship with defendants (Sweeney Decl. Ex. 34). Plaintiff also received a camera ready advertisement from Ford Motor Company that was directed toward defendants (Sweeney Decl. Ex. 30), as well as approximately eleven survey responses written by consumers who believed they were rating defendants' publication (Sweeney Decl. Ex. 35). Defendant issued a statement to its readership distinguishing its magazine from plaintiff's magazine. (Sweeney Decl. Ex. 31.)

The question is whether this is the type of confusion against which the Lanham Act was designed to protect. *Lang,* 949 F.2d at 582.

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another." *Lang,* 949 F.2d at 582 (internal quotation marks omitted). The relevant confusion is "that which affects the purchasing and selling of the goods or services in question." *Id.* at 583. Thus, "trademark infringement protects only against mistaken purchasing decisions *and not against confusion generally." Id.* (quoting *Restatement* § 20 reporter's note at 179) (emphasis added).

There is no evidence in this regard that anyone has made a mistaken purchasing decision—that is bought defendants' magazine thinking it was plaintiff's or placed advertising with plaintiff thinking it was advertising with defendants. In one instance, someone made an inquiry of plaintiff that should have been directed to defendant (Sweeney Decl. Ex. 34), but no erroneous purchasing decision resulted. Most of the emails that plaintiff claims "requested a business relationship" with defendants were in fact spam emails about "increasing sexual stamina," weight loss products, and other predictable topics. These emails in no way evidence any sort of *customer* confusion.

Second, defendants' statement to its readership that it "didn't mean to confuse [them]. There is another Sly Magazine, but trust us, the name is where the similarities end...." (Sweeney Decl. Ex. 31) is not linked to any potential or actual effect on customers' purchasing decisions. The few email inquiries and survey responses mistakenly sent to plaintiff that reference either Mr. Stallone or defendants' magazine largely demonstrate that any confusion stems from the fact that plaintiff elected to use the well-known nickname of a very famous actor to identify its product. (*See* Kohlman Decl. Ex. 14.) The authors of the emails do not indicate that they

accessed plaintiff's online magazine when they meant to buy defendants' print magazine, or that anyone confused plaintiff's product with defendants'. No evidence links the confusion evinced by the emails or statements to any potential or actual effect on customers' purchasing decisions. *Lang*, 949 F.2d at 583.

Because this case involves reverse confusion (those who sent emails were interested in defendants' magazine), "[e]vidence of actual reverse confusion that might support [plaintiff's] claim would involve purchasers or prospective purchasers of [plaintiff's magazine] who believed that they were affiliated with [defendants' magazine.]" *Lang*, 949 F.2d at 583. Plaintiff has proffered no evidence of such confusion. Those consumers whose emails plaintiff received by mistake were not purchasers or prospective purchasers of plaintiff's magazine. There is no reason to believe that the confusion represented by the emails could inflict commercial injury in the form of either diversion of sales, damage to goodwill, or loss of control over reputation. *Id.* Accordingly, plaintiff has not raised a genuine issue of material fact as to the actual confusion.

### 6. Defendants' intent

"This factor looks to whether the defendants adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583 (internal quotation marks omitted). The selection of a mark or trade dress that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith. *Id.* Prior knowledge of a senior user's mark is not inconsistent with good faith. *Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d. Cir.2004); *Arrow*

*Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir.1995).

Here, defendants were placed on actual notice of plaintiff's first use in commerce on the internet before their magazine was sent to the printer. (Defs.' Rule 56.1 Stmt, ¶¶ 49–50.) Defendants also received a cease and desist letter from plaintiff one month before their first issue went on sale. (Defs.' Rule 56.1 Stmt ¶ 50.)

However, there is no evidence of bad faith because there is no evidence that defendants chose the mark "SLY" to capitalize on the (non-existent) reputation and goodwill of plaintiff s mark. *See Lang*, 949 F.2d at 583. The use of Sylvester Stallone's nickname was an obvious choice for defendants, since Mr. Stallone was the magazine's creator and editorial director. (Defs.' Rule 56.1 Stmt. ¶ 18.) Defendants believed "SLY" would reflect the image and persona that defendants sought to convey—that of Mr. Stallone, who was known as "Sly" long before plaintiff came into existence.

Furthermore, plaintiff offers no evidence that could support an inference that defendants sought to capitalize on any confusion between it and plaintiff's publication. The evidence demonstrates that the costumers thought plaintiff was the publisher of the defendants' magazine, not the other way around. This factor weighs in favor of the defendants.

### 7. Quality of defendants' products

This factor looks to whether the senior user's reputation could be jeopardized or tarnished by virtue of the fact that the junior user's product is of inferior quality. *See Arrow*, 59 F.3d at 398; *The Am. Auto. Ass'n (Inc.) v. AAA Auto. Club of Queens*, 1999 WL 97918, at *8 (E.D.N.Y. Feb.8, 1999); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 748 (S.D.N.Y.1997). Plaintiff

makes no argument and submits no evidence demonstrating that the quality of the defendants' magazine damages the reputation of the plaintiff in any way. No reasonable juror could conclude that the quality of defendants' magazine damages the reputation of the plaintiff. This factor favors the defendants.

### 8. *Sophistication of customers*

■ Finally, the Court must consider the "general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *McGregor–Doniger,* 599 F.2d at 1137 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed.1969)). Generally speaking, "greater sophistication of consumers reduces the likelihood of confusion." *Brockmeyer,* 248 F.Supp.2d at 299. Courts have found that magazines are relatively inexpensive products, which are often bought on impulse. *See id.; Playboy,* 687 F.2d at 566.

■ The different media (online versus print) used to date by plaintiff and defendants make it highly unlikely that consumers, sophisticated or not, would be confused. *See Streetwise,* 159 F.3d at 746 ("due to the fact that the subject maps were rarely offered for sale at the same place and were generally impulse purchases, any lack of sophistication among buyers could not contribute to confusion between the two maps.") Furthermore, because these magazines contain distinctly different content (men's health and fitness versus women's fashion) and target different audiences (40+ men versus 25–35 year old women), it is unlikely that a consumer, sophisticated or not, would be unable to distinguish the publications. This factor favors the defendants.

### B. *Ultimate likelihood of confusion*

■ Considering all of the *Polaroid* factors, as applied to the uncontroverted facts, the Court concludes that there is no genuine issue of material fact as to the likelihood of customer confusion. There are significant differences between the content and presentation of plaintiff s online magazine and defendants' print publication. *See Brockmeyer,* 248 F.Supp.2d at 299. There are also differences between the look and manner in which the plaintiff's mark and the defendant's mark are portrayed. *See id.* Defendants' magazine is now defunct and the two publications will never appear side-by-side in a newsstand. The lack of bad faith on the part of the defendants, the fact that plaintiff is unlikely to "bridge the gap," and the lack of evidence of actual confusion further support the conclusion that there is no likelihood of confusion between the marks. All eight factors weigh in defendants' favor, and it is unlikely that the defendants' use of "SLY" caused either forward or reverse confusion between the plaintiff's and the defendants' marks. Consequently, the defendants' motion for summary judgment dismissing plaintiff's Lanham Act claims is granted.

## III. State Law Claims

### A. *Common law claims*

Plaintiff asserts claims for violations of trademark infringement, trade dress infringement, misappropriation, and unfair competition under New York's common law.

■ "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). To

establish unfair competition under New York common law, the plaintiff most prove (1) either actual confusion or a likelihood of confusion; and (2) bad faith on the part of the defendant. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34–35 (2d Cir.1995). Thus, the standard for federal mark infringement and unfair competition is virtually identical to that under New York common law, because "both require a showing that the public is likely to confuse the defendant's product or service with that of the plaintiff." *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977); *see also Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 498 n. 1 (2d Cir.1962); *Winner Int'l LLC v. Omori Enter., Inc.*, 60 F.Supp.2d 62, 73 (E.D.N.Y.1999); *Jeffrey Milstein*, 58 F.3d at 34–35; *Kaufman & Fisher Wish Co. v. F.A.O. Schwarz*, 184 F.Supp.2d 311, 324 (S.D.N.Y.2001).

Because plaintiff's claims fail under the Lanham Act, these claims necessarily also fail under New York common law. Furthermore, the evidence raises no genuine issue of fact as to bad faith. Consequently, plaintiff's claims under New York common law are dismissed.

### B. Anti–Dilution Statute

Plaintiff also brings a claim under the New York Anti–Dilution Statute, New York Gen.Bus.Law § 360–1. That statute states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

New York Gen.Bus.Law § 360–1. Relief is available under section 360–1 even when there is no likelihood of confusion as to the source of the product. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1048–49 (2d Cir.1992) (citing *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983); *Allied Maint.*, 42 N.Y.2d at 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162).

To prevail on its claim for dilution under New York State's General Business Law § 360–1, the plaintiff must prove (1) inherent or acquired distinctiveness, and (2) a likelihood of dilution. *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42 (2d Cir.1994); *Friesland Brands, B.V. v. Vietnam Nat. Milk Co.*, 228 F.Supp.2d 399, 413–14 (S.D.N.Y.2002). Although no secondary meaning needs to be shown, the statute "protects only extremely strong marks." *Bristol–Myers*, 973 F.2d at 1049 (internal quotation marks omitted). The likelihood of dilution may be shown by either blurring or tarnishment. *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 328 (S.D.N.Y.2000).

Although plaintiffs mark is inherently distinctive, as explained earlier, it is nonetheless a weak mark and does not merit protection under § 360–1. *See Bristol–Myers*, 973 F.2d at 1049. Plaintiff picked an already diluted name—one that was strongly associated with Mr. Stallone—as the mark for its magazine for women, so the "scope of the protection to which it is entitled is not as broad as that which might be accorded to a strong, coined name, as 'Kodak,' for instance." *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 543 (1st Cir.1957). Plaintiff knew or should have known that Mr. Stallone is known as "Sly" and that consumers might more easily and naturally associate "Sly" with Mr. Stallone (and so with a men's magazine) than with a women's fash-

ion/lifestyle magazine. (*See* Defs.' Rule 56.1 Stmt. ¶ 28.)

■ Furthermore, there is no evidence in the record of any blurring or tarnishment. "Blurring is the process that may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Brockmeyer,* 248 F.Supp.2d at 301 (internal quotations omitted) (emphasis in original). Here, there is no allegation that the defendants used or modified the plaintiff's mark to identify its magazine, or that the use of "SLY" in defendants' magazine would prevent the "SLY" mark from identifying the plaintiff's magazine. Additionally, it is not the case that the defendants' mark became so famous in the year or two defendants' magazine was published that it quickly overwhelmed plaintiff's mark; plaintiff simply chose a name that was already diluted by virtue of its association with Mr. Stallone. Defendants' advertising expenditures did not create the association between "SLY" and a tough-guy image in the minds of the public; Mr. Stallone's publicists created this association long ago.

■ Tarnishment exists when the plaintiff's mark is " 'linked to products of shoddy quality or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendants' goods with the plaintiff's unrelated goods.' " *U–Neek Inc. v. Wal–Mart Stores, Inc.,* 147 F.Supp.2d 158, 175 (S.D.N.Y.2001) (quoting *Deere,* 41 F.3d at 43). There is no allegation that defendants' publication is of shoddy quality. Nor can it be said that defendants' magazine is "unwholesome" or "unsavory." The association of plaintiff s mark with defen-

dants' magazine does not tarnish the plaintiff's mark.

Plaintiff's claim under the New York Anti–Dilution Statute is dismissed.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is granted. This constitutes the decision and order of the Court.